USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/4/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SARAH TUBBS,

                    Plaintiff,

        -against-

STONY BROOK UNIVERSITY a/k/a SUNY
STONY BROOK; STATE UNIVERSITY
OF NEW YORK; and DANIEL VERDEJO,

                    Defendants.

15 Civ. 0517 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiff Sarah Tubbs ("Tubbs" or "Plaintiff") commenced this action by complaint filed

January 23, 2015, against defendants Stony Brook University, the State University of New York

("SUNY") (together, the "University Defendants"), and Daniel Verdejo ("Verdejo")

(collectively, "Defendants"). Plaintiff brings the action pursuant to 20 U.S.C. § 1681, alleging

that University Defendants were deliberately indifferent with regards to the alleged sexual

assault of Plaintiff and therefore deprived Plaintiff of equal access to educational opportunities,

in violation of her right to be free from sexual discrimination under Title IX. Plaintiff

additionally asserts claims of assault, battery, and intentional infliction of emotional distress

against defendant Verdejo.

University Defendants now move to dismiss the Title IX claims against them pursuant to

Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be

granted. For the following reasons, University Defendants' motion is DENIED.

## BACKGROUND

All facts are taken from the Complaint and are accepted as true for the purposes of this

motion. Sarah Tubbs attended SUNY Stony Brook from the fall of 2010 to the spring of 2014, where she studied Social Welfare and Hispanic Languages and Literature. (Complaint, ECF. No 1, ¶¶ 13-16.) During her time at Stony Brook, Tubbs also worked as a Senior Resident Assistant and Resident Assistant at Langmuir College (part of Stony Brook's campus) and was the president and founder of a Big Brother/Big Sister partnership with the university. (*Id.* ¶ 14.)

Prior to the start of her final semester, Tubbs attended a party at the West Campus Apartments on the night of January 25, 2014. (*Id.* ¶ 17.) Verdejo was also in attendance at this party, where he interacted with Tubbs. (*Id.* ¶ 19.) Tubbs and Verdejo played a drinking game, during which Verdejo replaced Tubbs' cup with a cup filled with straight liquor. (*Id.* ¶ 21.)

After the party, Tubbs returned with Verdejo to his dorm room with the intention of engaging in sexual relations. (*Id.* ¶ 23.) After the two started kissing, Tubbs changed her mind and decided she did not want to have any further sexual contact with Verdejo. (*Id.* ¶ 25.) She communicated her disinterest and attempted to physically resist Verdejo's advances. (*Id.*) However, Verdejo overpowered Tubbs, became violent, and forced sexual contact. (*Id.* ¶ 26.) Tubbs was physically examined after the attack as the attack caused significant bruising. (*Id.* ¶¶ 33-36.)

On January 28, 2014, Tubbs went with two friends to campus police to report the incident. (*Id.* ¶ 37.) The campus police interviewed Tubbs in a hurried, insensitive manner and did not fully explain Tubbs' options to her. (*Id.* ¶¶ 38-41.) The lead detective recommended that Tubbs be examined by a Sexual Assault Nurse Examiner and return to file a formal complaint following the examination. (*Id.* ¶ 39.) Though Tubbs was given a document explaining her legal options, which included proceeding with a case through the university's discipline process and/or reporting the assault to non-campus, local police for investigation, Tubbs did not understand the

2

"legal and emotional ramifications" of her choices, and the detectives did not explain them to her despite her active questioning. (*Id.* ¶¶ 40-42.) The detectives did not take photos of Tubbs' bruising or encourage her to speak to Stony Brook's Title IX coordinator. (*Id.* ¶¶ 43, 45.) After the interview, the detectives drove Tubbs and her friends to pick up the clothing she wore on the night of the assault and to Stony Brook Medical Center for examination. (*Id.* ¶¶ 44, 46.)

Approximately two weeks later, Tubbs met with the university police for a second time to file a formal, written complaint. (*Id.* ¶¶ 48-49.) Again, the officers were discouraging and abrasive, and the officers told Tubbs that she did not have a viable case against Verdejo. (*Id.* ¶¶ 49-51.) Based on this comment, Tubbs did not report the matter to the District Attorney. (*Id.* ¶ 52.)

Tubbs did, however, report the incident to Stony Brook's Community Standards Office ("CSO"). (*Id.* ¶ 53.) In mid-February, Tubbs had an initial telephone interview with the CSO director, Matty Orlich. (*Id.* ¶ 54.) Orlich was initially supportive but became hostile and unhelpful once Tubbs expressed her desire to pursue a full investigation and disciplinary charges. (*Id.* ¶ 58.) Orlich advised Tubbs that the university had a policy of notifying professors when a student is dealing with a personal difficulty, without disclosing the nature of the incident, and offered to provide this sort of notification to Tubbs' professors, if she wished. (*Id.* ¶ 62.) Despite numerous requests to initiate this process, Orlich and the university failed to notify Tubbs' professors, causing Tubbs to notify them herself in order to explain her slip in performance. (*Id.* ¶¶ 62-66.) Due to Orlich's "erratic attention" to the case, Tubbs asked her boss, the Residence Hall Director for Langmuir College—Meera Ramsoondar-Cuevas—to intervene on her behalf. (*Id.* ¶ 60.) Ramsoondar-Cuevas did intervene but failed to receive timely or satisfactory responses from Orlich or CSO. (*Id.* ¶ 61.)

Around late March, Orlich informed Tubbs that she was nearly finished with the investigation in a conversation Tubbs describes as "accusatory" and in which Orlich "took pains" to point out any inconsistency in Tubbs' story. (*Id.* ¶¶ 68-70.) At this time, Orlich informed Tubbs that the disciplinary hearing for Verdejo would occur by the end of April. (*Id.* ¶ 73.) The hearing did not occur until May 16, 2014, less than one week before graduation and during Tubbs' final exams. (*Id.*)  Approximately one week prior to the hearing, Tubbs was informed by her advisor that she would be responsible for prosecuting the case against Verdejo at the disciplinary hearing. (*Id.* ¶ 74.) Tubbs had not been advised of this responsibility previously and therefore scrambled to prepare witnesses and other evidence while also prepping for her final exams. (*Id.* ¶¶ 74-75.) Tubbs was additionally required to question Verdejo and be questioned by him. (*Id.* ¶ 80.) As a result, Tubbs experienced significant emotional stress. (*Id.* ¶ 82.) Seeking a trustworthy supporter, Tubbs requested that her therapist—Dr. Smita Majumdar Das—be allowed to attend the hearing. (*Id.*) Though Dr. Majumdar Das had been allowed to sit in on other proceedings, Tubbs' request was denied. (*Id.* ¶ 83.)

The hearing concluded on May 16, 2014, and Orlich informed Tubbs that Verdejo had been found not responsible for all charges on May 22, 2014. (*Id.* ¶¶ 86-88.) Tubbs timely filed for appeal. (*Id.* ¶ 91.) By letter dated August 28, 2014, the Director of Campus Recreation—Jay Souza—advised Tubbs that the Hearing Board did not adequately consider the definition of consent in the University Student Code. (*Id.* ¶ 92.) Souza additionally informed Tubbs that CSO would contact her regarding next steps. (*Id.* ¶ 93.) As of the date of the Complaint, Tubbs had not received any substantive response or further information regarding these "next steps." (*Id.* ¶ 94.)

As a result of the attack and the university's failure to properly respond, Tubbs experienced significant physical and emotional trauma. (*Id.* ¶¶ 108-112.) Tubbs suffered from

vivid flashbacks as well as physical pain and was diagnosed with Post Traumatic Stress Disorder by her therapist. (*Id.* ¶¶ 112, 122.) Tubbs had trouble concentrating and comprehending and, as a result, was forced to postpone an exam. (*Id.* ¶ 116, 119.) As a resident advisor, Tubbs was no longer as responsive and helpful with residents' problems and issues. (*Id.* ¶ 115.) Overall, the stress and emotional trauma resulting from the attack and the university's response significantly affected Tubbs' work and academic performance. (*Id.* ¶¶ 108-124.)

The U.S. Department of Education Office for Civil Rights ("OCR") previously investigated the SUNY system's policies and handling of sexual assault and harassment incidents during the 2007/08 and 2010/11 school years. (*Id.* ¶¶ 95, 97.) The investigation surveyed SUNY's policies generally and specifically targeted four SUNY schools: Albany, Buffalo State, Morrisville, and New Paltz. (*Id.* ¶ 95.) The purpose of the investigation was to "determine if SUNY had responded promptly and effectively" to claims of sexual assault and harassment. (*Id.* ¶ 96.) By letter dated October 31, 2013 (the "OCR Letter")[1], OCR issued its findings and noted several compliance concerns, including that students were not notified of the Title IX coordinator or how to contact her and that SUNY system procedures do not provide for a prompt and equitable resolution of complaints of sex discrimination. (*Id.* ¶¶ 98-99.) As a result of the investigation, SUNY executed a Voluntary Resolution Agreement (the "VRA")[2] in which it agreed to remedy a number of the Title IX deficiencies. (*Id.* ¶ 100.) According to Plaintiff, SUNY had not yet implemented these changes at the time of Verdejo's attack. (*Id.* ¶ 101.) As support for this assertion, Tubb provides an example of two football players who were accused of sexual assault, and, in response, the players were merely transferred to another school within

---

[1] The OCR Letter to Dr. Nancy L. Zimpher is publicly available on OCR's website, at: http://www2.ed.gov/documents/press-releases/suny-new-york-letter.doc.
[2] The VRA is publicly available on OCR's website, at: http://www2.ed.gov/documents/press-releases/suny-new-york-agreement.doc.

the SUNY system rather than properly disciplined. (*Id.* ¶ 103.) From 2010-2012, the number of

sexual assaults occurring on Stony Brook's campus increased from 7 to 17, and instances of

sexual assault/violence have continued to occur through 2014. (*Id.* ¶ 105.)[3] As a result, OCR has

initiated a new investigation, specifically concerning Stony Brook's handing of complaints of

sexual assault and harassment. (*Id.* ¶ 107.)

## STANDARD ON A MOTION TO DISMISS

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for

failure to state a claim upon which relief can be granted, a complaint must include "sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570

(2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.* (citing *Twombly*, 550 U.S. at 556).

"When there are well-pleaded factual allegations [in the complaint], a court should

assume their veracity and then determine whether they plausibly give rise to an entitlement to

relief." *Iqbal*, 556 U.S. at 679. The court must thus "take all well-plead factual allegations as

true, and all reasonable inferences are drawn and viewed in a light most favorable to the

plaintiff[ ]." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996). However, the presumption of truth

does not extend to "legal conclusions, and threadbare recitals of the elements of the cause of

action." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. 662) (internal

quotation marks omitted). A plaintiff must provide "more than labels and conclusions" to show

---

[3] *See also* Stony Brook 2014 Annual Security Report, at 16, *available at*
https://ir.stonybrook.edu/xmlui/bitstream/handle/11401/11301/2014%20Annual%20Security%20and%20Fire%20R
eport.pdf?sequence=1).

he is entitled to relief. *Twombly*, 550 U.S. at 555.

## DISCUSSION

## I.     Consideration of Exhibit Submitted by Defendants

As an initial matter, the Court must decide whether it can consider and/or take judicial notice of the exhibits submitted by Defendants. On a motion to dismiss, "the Court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents 'integral' to the complaint and relied upon in it."[4] *Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. 2014); *see Manley v. Utzinger*, No. 10 Civ. 2210 (LTS)(HBP), 2011 WL 2947008, at *1 n.1 (S.D.N.Y. July 21, 2011) ("The Court may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, and documents possessed by or known to the plaintiff and upon which the plaintiff relied in bringing the suit."). When extrinsic materials are improperly submitted to the Court for consideration in connection with a 12(b)(6) motion, the materials must either be excluded, or the motion must be converted to one for summary judgment under Federal Rule of Civil Procedure 56, after affording the parties the opportunity to conduct appropriate discovery and submit additional supporting materials. See Fed. R. Civ. P. 12(d); *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000).

---

[4] Though not particularly relevant to the 22 exhibits here, the Court may also consider "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *Heckman*, 568 F. App'x at 43. Under Federal Rule of Evidence 201, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). "Put another way, facts appropriate for judicial notice must 'meet either [one of the] test[s] of indisputability contained in Rule 201(b): they [should be] common knowledge, [or] ... derived from an unimpeachable source.'" *Alvarez v. Cnty. of Orange, N.Y.*, 95 F. Supp. 3d 385, 2015 WL 1332347, at *11 (S.D.N.Y. 2015) (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)). "If a court takes judicial notice of documents pertinent to a motion to dismiss, it need not convert the motion to dismiss into a motion for summary judgment." *Chapman v. Abbott Labs.*, 930 F. Supp. 2d 1321, 1323 (M.D. Fla. 2013); *see Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000); *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988).

First, a Court may consider a document incorporated into the Complaint by reference, but "[a] mere passing reference or even references, however, to a document outside of the complaint does not, on its own, incorporate the document into the complaint itself." *Williams v. Time Warner Inc*., 440 F. App'x 7, 9 (2d Cir. 2011) (citing *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004); *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)). *See also Goldman v. Belden,* 754 F.2d 1059, 1066 (2d Cir. 1985) ("The documents here were to some extent quoted, but limited quotation does not constitute incorporation by reference."). Moreover, a document may be incorporated when a plaintiff had possession or knowledge of the document, upon which they relied in drafting the complaint. *See Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (holding the complaint is deemed to include "documents plaintiffs either possessed or knew about and upon which they relied in bringing the suit."). *See also Cortec Indus., Inc. v. Sum Holding L.P*., 949 F.2d 42, 48 (2d Cir. 1991) ("[w]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.").

A court may additionally consider a document not incorporated by reference into the complaint "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)). "A document is not 'integral' simply because its contents are highly relevant to a plaintiff's allegations, but only when it is clear that the plaintiff relied on the document in preparing his complaint." *Williams v. City of New York*, No. 14-CV-5123 NRB, 2015 WL 4461716, at *2 (S.D.N.Y. July 21, 2015) *reconsideration denied sub nom. Williams v. The City of New York*, No. 14 CIV. 5123 NRB, 2015 WL 5190586 (S.D.N.Y. Sept. 3, 2015).

In the instant case, the University Defendants have submitted 21 exhibits in support of their motion to dismiss:

| Exhibit 2 | 1/28/2014 | Sexual Assault Reporting form, signed by Tubbs |
|---|---|---|
| Exhibit 3 | 2/13/2014 | Tubbs' statement to police |
| Exhibit 4 | 2/13/2014 | Sexual Assault Reporting form, signed by Tubbs |
| Exhibit 5 | 1/30/2014 | Email from Orlich to Tubbs (i.e., please contact me regarding important matter). |
| Exhibit 6 | 2/13/2014 | Internal CSO email |
| Exhibit 7 | 2/27/2014 | Letters to Tubbs' professors noting her absence on 2/24 was due to CSO meeting |
| Exhibit 8 | 2/25/2014 | Calendar invite for CSO meeting with Verdejo |
| Exhibit 9 | 2/27/2014 | CSO letter to Verdejo informing him of alleged violations |
| Exhibit 10 | 3/10/2014 | Email from Orlich to Tubbs (i.e., please contact me regarding important matter) |
| Exhibit 11 | 4/8/2014 | Calendar invite for CSO meeting with Tubbs |
| Exhibit 12 | 4/14/2014 | Email from Tubbs to CSO – "I would like to proceed" |
| Exhibit 13 | 4/24/2014 | CSO Notice of Charges to Verdejo |
| Exhibit 14 | 10/7/2013 | University Code of Conduct |
| Exhibit 15 | 5/5/2014 | CSO Email to Tubbs attaching Directive to Appear as Complainant |
| Exhibit 16 | 5/14/2014 | Email to Tubbs advising of divider in hearing room |
| Exhibit 17 | 5/15/2014 | Email to Tubbs denying request to have therapist at hearing |
| Exhibit 18 | 5/16/2014 | Hearing transcript |
| Exhibit 19 | 7/9/2014 | Written hearing disposition |
| Exhibit 20 | 7/17/2014 | Tubbs' appeal of hearing disposition |
| Exhibit 21 | 8/28/2014 | Souza's notice to Tubbs granting her appeal |
| Exhibit 22 | 3/6/2015 | Written disposition of reconvened hearing, post-appeal |

(*See* ECF No. 33, Exhibits 2-22.) University Defendants contend that all 21 exhibits can be properly considered on a motion to dismiss because each one is "integral to the complaint." (Reply Memorandum of Law of Defendant the State University of New York in Further Support of its Motion to Dismiss Plaintiff's Complaint ("Def.'s Reply"), ECF No. 35, at 2.) Plaintiff concedes that exhibits 14 (the University Code of Conduct) and 21 (Souza's notice to Tubbs granting her appeal) were integral in the process of drafting the complaint and can therefore be considered by the Court. (Memorandum of Law in Opposition to Defendant SUNY's Motion to Dismiss ("Pl.'s Memo"), ECF No. 36, at 10.)  However, Plaintiff opposes consideration of the remaining 19 exhibits. (*Id*.)

  As an initial matter, at least six of the exhibits (exhibits 6-9, 11, and 13) cannot be integral to the complaint because they are not documents of which the Plaintiff necessarily had knowledge or notice, including emails and calendar invites sent internally within CSO and CSO communications with Plaintiff's professors and Verdejo. Without such knowledge or notice, it would be impossible for Plaintiff to "rely heavily on the terms and effects" of the documents in drafting her Complaint. *See DiFolco,* 622 F.3d at 111. Similarly, exhibit 22, the written disposition of the reconvened hearing after appeal, cannot be considered integral to the Complaint because the document was drafted and released after the Complaint was filed.

  The Court similarly cannot find that the remaining exhibits are integral to the Complaint. The exhibits do trace the evolution of Plaintiff's complaint and expand on many of her allegations. However, this expansion does not make the exhibits proper on a motion to dismiss, where only documents that can be considered incorporated or integral are taken into consideration. In essence, the University Defendants ask the Court to weigh evidence that tends to disprove (or expand upon) Plaintiff's allegations. The Court will not entertain such an

exercise, which is clearly improper on a motion to dismiss.

More specifically, though many of the exhibits are generally referenced in the Complaint, it cannot be said that such documents are integral to (i.e., that Plaintiff must have relied heavily on their terms and effects in drafting) the Complaint. For example, exhibits 2-4 are Plaintiff's Sexual Assault Reporting forms and her official statement to the police. In her Complaint, Plaintiff does allege that she made such a statement and signed these forms. (*See* Compl., ¶¶ 42, 49-50.) However, these allegations do not rely on or require knowledge of the contents of the proposed exhibits. Similarly, Plaintiff alleges that a hearing occurred and that she was required to represent herself at such hearing. (*See Id.*, ¶¶ 73, 80.) Based on these allegations, the University Defendants contend that the hearing transcript is integral to the Complaint. Not so. On the contrary, the hearing transcript is evidence tending to prove or disprove Plaintiff's allegations; consideration of such evidence is wholly improper on a motion to dismiss, where the inquiry is limited to whether Plaintiff's allegations, accepted as true, state a claim as a matter of law. The same is true for the remaining exhibits: it cannot be said that Plaintiff relied heavily on their terms and effects—essentially their content—in drafting the complaint, simply because the Complaint makes general reference to the documents. Therefore, the Court will not consider any of the exhibits objected to by Plaintiff and will only consider the Complaint, the University Code of Conduct, Souza's notice to Tubbs granting her appeal, the OCR letter, and the VRA.[5]

## II.    Title IX Claims

Title IX provides, in pertinent part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of or be subjected to discrimination

---

[5] The OCR Letter and the VRA are appropriately considered because they are publicly available on the Department of Education's website. *See Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 411 (S.D.N.Y. 2011) ("it is well-established that courts may take judicial notice of publicly available documents on a motion to dismiss") (citing *Byrd v. City of N.Y.*, No. 04–CV–1396, 2005 WL 1349876, at *1 (2d Cir. June 8, 2005)).

under any education program or activity receiving Federal financial assistance." 20 U.S.C. §

168l(a). "'Discrimination' for purposes of Title IX liability, is not limited to disparate provision

of programs, aid, benefits or services or inequitable application of rules or sanctions. [] It has,

instead, been recognized as also encompassing … hostile educational environment sexual

harassment." *Hayut v. State Univ. of New York*, 352 F.3d 733, 750 (2d Cir. 2003) (internal

citations omitted). Under Title IX, "recipients of federal funding may be liable for 'subject[ing]'

their students to discrimination where the recipient is deliberately indifferent to known acts of

student-on-student sexual harassment and the harasser is under the school's disciplinary

authority." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 646-47

(1999). However, not all harassment is actionable. "Funding recipients are properly held liable in

damages only where they are *deliberately indifferent* to sexual harassment, of which they have

*actual knowledge*, that is so *severe, pervasive, and objectively offensive* that it can be said to

deprive the victims of access to the educational opportunities or benefits provided by the

school." *Id.* at 650 (emphasis added).

A defendant acts with deliberate indifference "when the defendant's response to known

discrimination 'is clearly unreasonable in light of the known circumstances.'" *Gant v.

Wallingford Bd. of Educ.,* 195 F.3d 134, 141 (2d Cir. 1999) (quoting *Davis*, 526 U.S. at 648). *See

also McGrath v. Dominican Coll. of Blauvelt, New York,* 672 F. Supp. 2d 477, 488 (S.D.N.Y.

2009) ("The standard for deliberate indifference is whether the school failed to act reasonably

under the circumstances."). Additionally, in some circumstances, a single instance of sexual

assault may satisfy the severe, pervasive, and objectively offensive standard. *See T.P. ex rel.

Patterson v. Elmsford Union Free Sch. Dist.,* No. 11 CV 5133 VB, 2012 WL 860367, at *8

(S.D.N.Y. Feb. 27, 2012) ("a single incident of sexual assault may suffice to create liability

under *Davis"*); *Bliss v. Putnam Valley Cent. Sch. Dist.,* 2011 U.S. Dist. LEXIS 35485, at *13–14; *M. v. Stamford Bd. of Educ.,* 2008 U.S. Dist. LEXIS 51933, at *24 (D. Conn. July 7, 2008) (finding one incident of sexual assault to be sufficiently severe so as to preclude summary judgment); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir. 1999) (noting that a sexual assault constitutes "severe, pervasive, and objectively offensive sexual harassment").

### A. *Deliberate Indifference Following the Alleged Assault*

In the instant case, though the University Defendants concede that they were aware of the alleged assault, they argue that "Plaintiff simply has failed to plead, as a matter of law, a plausible claim that SUNY was deliberately indifferent" in its response to Plaintiff's report of the assault. (Def.'s Reply, at 4.) However, University Defendants' support for this claim lies exclusively in the extrinsic evidence submitted with their motion, and the Court will not consider such evidence. Relying solely on Complaint, the University Code of Conduct, and Souza's notice to Tubbs granting her appeal, Plaintiff has sufficiently pleaded a plausible claim for deliberate indifference.

Specifically, Plaintiff alleges a number of instances of misconduct that a reasonable jury could conclude were clearly unreasonable in light of the circumstances, including (1) campus police did not explain Tubbs' options to her or take photographs of her bruising stemming from the alleged assault, (2) CSO and Orlich failed to notify Tubbs' professors of her ongoing hardship, despite their offer to do so, (3) CSO took over 3 months to complete an investigation and hold a disciplinary hearing,[6] (4) Tubbs was required to present her case and question her

---

[6] University Defendants argue that the delay is not unreasonable because Tubbs "did not authorize the commencement of a proceeding until April 14, 2014, more than two-and-a-half months after the alleged sexual assault." (*See* Defendant the State University of New York's Memorandum of Law in Support of its Motion to Dismiss Plaintiff's Complaint, ECF No. 34, at 16.) The Court will not consider the emails of Tubbs, but even assuming, *arguendo*, that Tubbs did not authorize a proceeding, the university has an independent obligation to investigate allegations of sexual misconduct. *See* OCR Letter (The duty to conduct a Title IX investigation is "a university's responsibility, regardless of whether a student has complained, asked the university to take action, or

attacker in the middle of her final exam period, and (5) Tubbs was not allowed to have her therapist present at the proceeding for emotional and mental support. Viewing these facts in the light most favorable to the Plaintiff, the Complaint contains sufficient allegations to state a claim for deliberate indifference as a matter of law, and University Defendants' motion to dismiss on this ground must be denied.

> B.   *Systematic Deliberate Indifference Prior to the Alleged Assault*

In addition to her Title IX claims arising out of the University Defendants' alleged *post-assault* conduct, Plaintiff contends that the University Defendants are also liable for their *pre-assault* response to the general problem of sexual violence among its students. Specifically, Plaintiff alleges that "Stony Brook was deliberately indifferent in responding to [] prior sexual assaults, thus signaling to the campus community that sexual misconduct is not seriously addressed and leaving students liable or vulnerable to such misconduct on campus." (Pl.'s Memo, at 25.) In limited circumstances, a school's inadequate response to the problem of sexual violence can support a student-on-student harassment claim.

As an initial matter, the Court finds that the conclusions and statements in the OCR Letter and the VRA can be properly considered as a basis for the claim that University Defendants were deliberately indifferent. University Defendants argue that these documents should not be considered because "OCR did not conduct an on-site review of Stony Brook during the investigation" and the documents do not "specifically address Stony Brook's policies or

---

identified the harassment as a form of discrimination."). *See also Mills Pub. Sch. Dist.,* OCR Case No. 01–93–1123 (Dep't. of Educ. May 19, 1994) ("The District had an obligation to enact a grievance procedure which would result in prompt and equitable resolution of the sexual harassment complaints, regardless of any criminal process."); *Acad. Sch. Dist. No. 20,* OCR Case No. 8–93–1023 (Dep't. of Educ. April 16, 1993) (holding where school district "decided to defer to the criminal investigation undertaken by the Sheriff's Department" that the school district was obligated to conduct an investigation and make its own determination if a violation of Title IX has occurred notwithstanding the existence of a related criminal investigation).

environment with respect to complaints of sexual assault/violence." (Defendant the State University of New York's Memorandum of Law in Support of its Motion to Dismiss Plaintiff's Complaint, ECF No. 34, at 21-22.) However, the OCR Letter clearly states that OCR's investigation "examined the State University of New York's (SUNY) handling of complaints of sexual assault/violence and sexual harassment under its various procedures, including those used systemwide." (OCR Letter, at 1.) Accordingly, the findings concerned both SUNY generally and the individual campuses reviewed. Therefore, to the extent Plaintiff seeks to rely on the OCR's findings of policy deficiencies throughout the SUNY system and SUNY's responses in the VRA, such reliance is proper.

      With regards to her pre-assault claim, Plaintiff alleges that the University Defendants have an "official policy of failing adequately to respond to on-campus sexual violence," which caused Tubbs' assault. (Pl.'s Memo, at 25.) Plaintiff bases this "official policy" argument on the ruling in *Gebser v. Lago Vista Indep. Sch. Dist.* that "in cases … that *do not involve official policy of the recipient entity*, … a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." 524 U.S. 274, 290 (1998) (emphasis added). However, *Gebser* did not involve a claim of sexual harassment or an official policy of the recipient entity, and courts generally have not expanded on the circumstances in which an "official policy" will be sufficient to impose Title IX liability. The one court that has applied the "official policy" analysis to a case of sexual harassment, *Simpson v. Univ. of Colorado Boulder*. 500 F.3d 1170, 1178 (10th Cir. 2007), held that a "funding recipient can be said to have intentionally acted in clear violation of Title IX, … when the violation is caused by official

policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient." *Id.* at 1178 (internal citation omitted). In *Simpson,* the court held the university responsible under Title IX because official university policy failed to properly supervise the recruiting efforts of their football team. In other words, the Tenth Circuit allowed the pre-assault deliberate indifference claim to stand, on the grounds that the maintenance and support of the recruiting program, without proper supervision or training, constituted an "official policy" of the university. Importantly, the court in *Simpson* stressed the fact that the university maintained this program *despite* an actual knowledge of a significantly heightened risk of sexual assault. Specifically, the court in *Simpson* held that "(1) [the football coach had knowledge of] serious risk of sexual harassment and assault during college-football recruiting efforts; (2) [he] knew that such assaults had indeed occurred during CU recruiting visits; [and] (3) [he] nevertheless maintained an unsupervised player-host program to show high-school recruits 'a good time.'" *Id.* at 1184. Thus, the court implied—and this Court agrees—that in order for a university to violate Title IX through a policy of deliberate indifference, it must have actual knowledge of a heightened risk that is specific enough to allow it to remedy such a policy.[7]

However, the precise boundaries of the actual notice requirement remain undefined, and the Second Circuit has not addressed this requirement or examined a pre-assault Title IX claim. *See Crandell v. New York Coll. of Osteopathic Med.,* 87 F. Supp. 2d 304, 320 (S.D.N.Y. 2000); *Doe v. Bibb Cty. Sch. Dist.*, 83 F. Supp. 3d 1300, 1307 (M.D. Ga. 2015) *reconsideration denied,* No. 5:12-CV-468 MTT, 2015 WL 778343 (M.D. Ga. Feb. 24, 2015) (citing *Ross v. Corp. of*

---

[7] *Gebser* did not address whether actual knowledge of the risk would be necessary in cases where an official policy exists. 524 U.S. at 290. However, without actual knowledge, the policy itself would not be *deliberately* indifferent.

*Mercer Univ.*, 506 F. Supp. 2d 1325, 1348 (M.D. Ga. 2007)). Generally, cases that hold a school responsible for pre-assault deliberate indifference involve actual knowledge of sexual assault(s) committed in a particular context or program or by a particular perpetrator or perpetrators. *See Zamora v. N. Salem Cent. Sch. Dist.*, 414 F.Supp.2d 418, 424 (S.D.N.Y. 2006) (internal citation omitted) (holding that the actual knowledge standard may be satisfied by knowledge of a "substantial risk of serious harm" where there have been multiple prior allegations of the same or similar conduct that is at issue); *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1294-96 (11th Cir. 2007) (finding actual knowledge sufficient to impose Title IX liability for a student's rape that occurred in a UGA basketball player's dorm room where UGA officials' recruited the basketball player when they allegedly knew about his history of past sexual harassment at other colleges); *Mathis v. Wayne County Board of Education,* 782 F. Supp. 2d 542 (M.D. Tenn. 2011) (finding sufficient knowledge where both the victims and the perpetrators were members of specific groups of students that had previously been involved in similar instances of assault, in the same context). In so holding, these courts acknowledge that something more than general knowledge of assaults campus-wide (i.e., some greater specificity) is required to satisfy the actual knowledge requirement. *See M. v. Stamford Bd. of Educ.*, No. 3:05–CV–0177, 2008 WL 2704704, at *10 (D. Conn. July 7, 2008) (finding only school board's lack of disciplinary action after *notice of requisite specificity* could permit jury to find board made student more vulnerable to harassment), *vacated in part on other grounds*, 2008 WL 4197047 (D. Conn. Sept. 9, 2008).

In light of this Court's interpretation of *Simpson* and the heightened knowledge requirement, Plaintiff's proper argument is that the University Defendants had actual knowledge of a "significant increase in reported sexual assaults at Stony Brook over the years" and were on

notice that their responses to and policies regarding sexual assaults were deficient, which created a substantial risk of abuse to students, and their subsequent failure to remedy their responses and policies, in light of this knowledge, amounts to deliberate indifference. On the other hand, University Defendants argue that "in order to sufficiently allege pre-incident deliberate indifference on the part of SUNY for Title IX purposes, a plaintiff must allege *more* than simply stating that there have been sexual assaults on campus." (Def.'s Memo, at 19.) *See Ross*, 506 F. Supp. 2d at 1356 ("The mere fact that students at Mercer have been victims of sexual assault in the past is, unfortunately, not uncommon for a University setting. Past incidents of assault alone-without any evidence of deliberate indifference on Mercer's part-are not enough to trigger Title IX liability for Mercer."). The Court agrees that a plaintiff must allege additional facts beyond past incidents of assault on campus to sustain a pre-assault Title IX claim. *See Bibb*, 83 F. Supp. 3d at 1309 ("actual knowledge has to mean something"). However, as in the instant case, "analysis of actual knowledge and the analysis of deliberate indifference are [often] inextricably intertwined." *Carabello v. New York City Dep't of Educ.*, 928 F. Supp. 2d 627, 641 (E.D.N.Y. 2013) (internal citation and quotation marks omitted). Here, OCR conducted an investigation of University Defendants' policies and procedures regarding sexual assault and concluded that many of them were deficient. In response, SUNY agreed to remedy these deficiencies but failed to do so prior to Plaintiff's assault. The knowledge of an increase in sexual assaults on campus,[8] combined with notice that SUNY's policies and responses to sexual assaults are deficient and a subsequent failure to remedy the deficiencies, may satisfy the heightened pleading standard. Therefore, the fact that SUNY/Stony Brook failed to remedy these policies and did not enact the changes agreed to in the VRA may be "clearly unreasonable in light of the circumstances," and

---

[8] Instances of reported sexual violence increased from 2010-2012 (the years covered by the OCR investigation) and have continued to occur through 2014.

Plaintiff's pre-assault Title IX claim cannot be dismissed.

## CONCLUSION

For the foregoing reasons, University Defendants' motion to dismiss is DENIED in its entirety. The Court respectfully directs the Clerk to terminate the motion at ECF No. 32. University Defendants are directed to file an answer to the Complaint within 30 days of the date of this Order. The parties are further directed to contact U.S. Magistrate Judge Davison to schedule a conference in light of the Court's decision.

Dated:   March 4, 2016
          White Plains, New York

SO ORDERED:

NELSON S. ROMÁN
United States District Judge