UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/30/18

---

SARAH TUBBS,

                              Plaintiff,

          -against-

STONY BROOK UNIVERSITY a/k/a SUNY
STONY BROOK; STATE UNIVERSITY
OF NEW YORK; and DANIEL VERDEJO,

                              Defendants.

---

15 Civ. 0517 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiff Sarah Tubbs ("Plaintiff") commenced this action by filing a complaint on January 23, 2015, (*See* Complaint, ("Compl."), ECF No. 1), against defendants Stony Brook University ("SBU"), the State University of New York ("SUNY") (together, the "University Defendants"), and Daniel Verdejo ("Verdejo"). Plaintiff brings the action pursuant to 20 U.S.C. § 1681, alleging that University Defendants were deliberately indifferent regarding Plaintiff's sexual assault allegations, thereby depriving Plaintiff equal access to educational opportunities and violating her right to be free from sexual discrimination under Title IX. Plaintiff additionally asserts claims of assault, battery, and intentional infliction of emotional distress against Verdejo.

Before the Court is University Defendants' Motion for Summary Judgment on the Title IX claims. (*See* Motion for Summary Judgment, ECF No. 81.) For the reasons discussed below, University Defendants' Motion is GRANTED. In addition, as the granting of summary judgment terminates all federal claims in this action, the Court no longer exercises supplemental jurisdiction over Plaintiff's state law claims. Hence, for the ensuing reasons, the action is DISMISSED.

1

## I. BACKGROUND

This is a case about the arduous process undertaken by both a grievant and a University in dealing with difficult allegations related to sexual assault. The belaboring details are included to detail the pivotal issue before the Court, adequate process. The facts herein are taken from the parties' Rule 56.1 statements, affidavits, declarations, and exhibits, and are not in dispute except where so noted. All rational inferences are drawn in Plaintiff's favor.[1]

### A. The Alleged Sexual Assault in January 2014

In January 2014, Plaintiff and Verdejo were both students at Stony Brook University, where Plaintiff was a second-semester senior and Verdejo was a second-semester sophomore. (Pl. 56.1 ¶¶ 1, 3, ECF No. 93.). Plaintiff was pursuing degrees in Social Welfare and Hispanic Languages and Literature. (Klein Decl., Declaration of Sarah Tubbs, ("Tubbs Decl."), Ex. 2 20:3-5, ECF No. 82.) She was also working as a Residential Assistant ("RA"), which required her to return to campus prior to the start of each semester for various trainings on topics that included: sexual assault, sexual violence, when to notify the police, the Student Conduct Code, and the resources available to students in need. (*Id.* 30:10 - 44:9; Pl. 56.1 ¶ 2.)

In 2014, a few days before the start of her final semester, Plaintiff came back to campus for her usual RA training and attended a party on January 25, 2014. (Tubbs Decl. 80: 9-15.) At the party, Plaintiff drank somewhere between two and six drinks and interacted with Verdejo. (*See -*

---

[1] University Defendants note that Plaintiff's Counter-Statement of material facts is not a "short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried," as required by the Southern District's Local Rule for Fed. R. Civ. P. 56.1 (b). The Court finds that of Plaintiff's 112 additional paragraphs, the vast majority are either redundant with University Defendants' statement of material facts or are immaterial to the narrow issues before the Court. University Defendants request that this Court wholly disregard Plaintiff's entire Counter-Statement of facts for this reason. (*See* Def. Resp. to Pl. 56.1, ECF. No. 91, at 2.) The Court declines to grant the University Defendants' request. Instead, exercising its broad discretion in dealing with a party's failure to comply with local rules, the Court will refer to Plaintiff's Counter Statement sporadically, where it finds that they convey additional material facts that are relevant to the instant issues. *See Travelers Indem. Co. of Ill. v. Hunter Fan Co., Inc.*, No. 99 Civ. 4863 (JFK), 2002 WL 109567, at *6 (S.D.N.Y. Jan. 28, 2002) ("A district court has broad discretion whether to overlook a party's failure to comply with local court rules.").

21.)[2] Plaintiff claims she became intoxicated. (*Id.*) After the party, Plaintiff voluntarily returned with Verdejo to his dorm room (*Id.*)[3] While in his dorm room that night, Plaintiff claims that she was sexually assaulted, forcibly restrained, coerced, forced to commit sodomy, and sexually abused while she was unconscious. (the "Incident.") (*Id.* ¶ 122.)[4]

Early in the morning on January 26, 2014, Plaintiff returned to her dormitory and described what generally happened to her to her two friends, Christine Publik and Ruby Escalera-Nater ("Ruby"). (Pl. 56.1 ¶ 5.) Ruby suggested Plaintiff report it to the Stony Brook Police ("UPD"). (*Id.* ¶ 6.) The subsequent journey about how Plaintiff pursued her complaint about the Incident, sought answers and closure, and how University Defendants responded really begins here.

## B. Plaintiff's Initial Reporting to UPD and Campus Residences

After Ruby convinced Plaintiff to report the Incident to UPD, Ruby called UPD, and UPD then sent two police officers to meet Plaintiff, Ruby, and Plaintiff's other friend, Davindra Lall (*Id.*). UPD brought all three students to the police station. (*Id.*) There, UPD Detective Michael Corbisiero ("Corbisiero") first spoke with Ruby, who said she had a "good conversation." (*Id.* ¶ 7.) Corbisiero thanked Ruby for encouraging Plaintiff to come in. (*Id.*)

Detective Corbisiero and a second Detective named Gary Borowski then conducted a preliminary interview with Plaintiff, who informed them that she wanted to tell them what had

---

[2] Though not relevant to the instant motion, Plaintiff has given a range of numbers regarding how many drinks she had at the party. (Def. Resp. to Pl. 56.1 ¶ 119.)

[3] In her Complaint, Plaintiff alleged that "in the early morning hours of Sunday January 26, 2014, [she] went to Verdejo's dorm room with the intention of engaging in sexual relations with him, which was partly caused by her overly-intoxicated state at the time. (Compl. ¶¶ 23-24). She stated that after the two started kissing, she changed her mind and decided that she did not want to have further sexual contact, which she communicated to Verdejo verbally and physically. It was at this point that Verdejo began forcing the contact and became more violent. (*Id.* ¶¶ 25-27.).

[4] Because the specific details and precise label for the alleged assault are not the material issue in this decision, the acts that transpired between Plaintiff and Verdejo on January 25-26, 2014 will broadly be deemed the "Incident."

happened to her, but did not want them to ask her questions; rather, she wanted to describe what happened. (*Id.* ¶ 8.) The Detectives obliged. (*Id.* ¶ 9.)

After Plaintiff provided her description, the Detectives gave her a Sexual Assault Reporting Options Form (the "Options Form") to review and sign. (*Id.*) The first page of the Options Form provided five options for reporting her complaint of sexual assault. (*See* Tubbs Dep. Ex. 5, ("Options Form") ECF No. 82.)[5] Detectives Corbisiero and Borowski went through each of these options with Plaintiff. (Pl. 56.1 ¶ 10.) Plaintiff did not want to select any of the first four options. (*Id.*) As for Option 5, Plaintiff claims she had questions regarding it because she did not understand how she could remain "anonymous" if she selected that option. (*Id.*) She claims that the Detectives were unable to answer her concerns satisfactorily. (*Id.* ¶ 11.)

Due to Plaintiff's dissatisfaction, and because she did not want to select any of the other four options, Plaintiff did not choose any of the five options in the Options Form that day and instead drew a diagonal line across the entire first page of the form and initialed the two boxes on the second page of the Form, including a box acknowledging that she had been provided with the Form "but has decided to remain anonymous." (*Id.* ¶¶ 11, 12; *see* Options Form.)

### C. Plaintiff's Hospital Visit and SANE Test

After meeting with Plaintiff, the UPD Detectives asked Plaintiff if she would agree to go to University Hospital to have a Sexual Assault Nurse Examiner ("SANE") examination, which would, among other things, collect evidence for possible submission to a crime lab for analysis. (Pl. 56.1 ¶ 13.) Plaintiff consented, and Detective Corbisiero and another officer, Officer Jason

---

[5] The options are: "Option 1: I choose to report the incident and pursue criminal charges through the University Police Department or other local police agency."; "Option 2: I choose to report the incident to the Vice President of Student Affairs/Office of University Community Standards"; "Option 3: I choose to file a sex discrimination grievance."; "Option 4: I choose to report the incident to University Labor Relations."; "Option 5: I choose to document the incident that has occurred, but have decided not to pursue further actions." (*See* Options Form.)

Fanning, drove Plaintiff and her friends to University Hospital for the SANE examination. (*Id.*) During the examination, the SANE nurse took photographs of Plaintiff's body. (*Id.*)

After the SANE examination, Detectives Corbisiero and Fanning drove Plaintiff and her friends back to Plaintiff's dormitory. (*Id.* ¶ 14.) That same evening, Plaintiff also provided the Detectives with the clothing she had worn on the night of January 25-26, 2014 (*Id.*) Detective Corbisiero advised Plaintiff that a "Detective from th[e] office [would] be in contact with her to complete a formal statement. (*Id.*) Plaintiff responded that she "wish[ed] to remain anonymous at this time, and would like no action to be taken by the university at this time." (*Id.* ¶ 15.)

On January 29, 2014, UPD Detective Peter Stumpf went to University Hospital to meet with Lori Thompson, a rape crisis advocate, at the Victims Information Bureau of Suffolk ("VIBS")[6], to obtain the results of the SANE examination. (*Id.* ¶ 16.) Ms. Thompson told Stumpf that Plaintiff had "indicated on the paperwork that she did not want anything released to the Police." (*Id.* ¶ 17.) Detective Stumpf then called Plaintiff, who told him that she knew that her paperwork indicated not to release the SANE documentation to the Police and that she was "still unsure on what she wanted done." (*Id.*)

### D. Plaintiff's Disclosure to University Community Standards

The next day, Plaintiff again met with Detective Corbisiero, who again explained her options and advised her of resources available to her. (*Id.* ¶ 18.) Plaintiff then signed a medical release form so that UPD could obtain the results of the SANE examination, but told Corbisiero that she was "still unsure of how she wishes to proceed" and again "at this time she wishes no action to be taken by the University." (*Id.*)

That same day, on another student's suggestion, Plaintiff's supervisor, Meera Cuevas

---

[6] VIBS is a non-profit entity over which Stony Brook has no control. (Pl. 56.1 ¶ 16.)

("Cuevas"), a Residence Hall Director ("RHD") in the building where Plaintiff was an RA, went to Plaintiff's dorm room. (*Id.* ¶ 19.) Plaintiff then informed Cuevas she had been assaulted, or "she didn't know exactly what happened to her," and "she didn't know what to do." (*Id.*)

During the conversation, Cuevas informed Plaintiff that, as an RHD, she would be required to report the allegation to someone senior at Campus Residences. (*Id.* ¶19.) At Plaintiff's request, Cuevas did not report the Incident to her direct supervisor – a male – but instead reported it to Gina Vanacore ("Vanacore"), then Associate Director of Residential Life. (*Id.*) Vanacore, immediately upon receiving the email, forwarded it to Matilde Orlich ("Orlich"), Director of University Community Standards ("UCS"). (*Id.* ¶ 20.)

### E. Plaintiff's Initial Meetings with UCS

On January 30, 2014, Orlich emailed Plaintiff, asking Plaintiff "to schedule an appointment for a meeting regarding an important matter," emphasizing that "[i]t is important that we speak with you as soon as possible." (*Id.* ¶ 21.) Orlich's purpose in contacting Plaintiff was to review with Plaintiff the options available to her, including counseling and psychological services, and explain to her the Title IX process and the process available to her through UCS. (*Id.* ¶ 22.) Because Plaintiff "did not want to deal with [Community Standards] at the time[,]" Plaintiff did not respond to this e-mail. (*Id.* ¶ 23.)[7]

Cuevas still encouraged Plaintiff to speak to UCS and spoke with Orlich about setting up a meeting with Plaintiff, Orlich and Cuevas. (*Id.* ¶ 24.) During that telephone conversation, Orlich told Cuevas about resources available at SBU to Plaintiff. (*Id.*) Cuevas then arranged

---

[7] Plaintiff asserts that she did not want to deal with Community Standards at the time because she had asked the police not to release anything to the University and then unexpectedly received the email. (Pl. 56.1 ¶ 23.) The undisputed facts, however, reflect that when Plaintiff met with Cuevas, Cuevas expressly told Plaintiff that she was going to have to report the incident up. (*Id.* ¶¶ 19-20.)

the in-person meeting with the three of them for February 13, 2014. (*Id.* ¶ 25.) Due to an unexpected snowstorm, the in-person meeting was later changed to a conference call. (*Id.*)

During the call, Orlich answered Plaintiffs questions about the UCS disciplinary process, the investigation process, the disciplinary Hearing, and Plaintiff's potential role in the Hearing. (*Id.* ¶ 26.) Plaintiff asked if she would have to be in the same room as Verdejo during the Hearing to which Orlich replied that Plaintiff had "other options" such as using Skype, telephoning in, or having someone from UCS present her case. (*Id.* ¶ 27.). Plaintiff declined these options, including that of having someone present her case on her behalf, "[b]ecause it is what happened to [her], and [she] wanted to use [her] own words." (*Id.*)

During the same conference call, Orlich "got Plaintiff at ease" with the disciplinary process, and asked Plaintiff to come in for an "intake" to describe to UCS what had happened to her. (*Id.* ¶ 28.) Because Orlich was to be out of town the following week for a conference, Plaintiff agreed to do the intake meeting with Sandee Maung, the Assistant Director of UCS, and Marjolie Leonard, then Acting Director for Stony Brook's Office of Diversity and Affirmative Action. (*Id.*) USC arranged the intake for February 19, 2014. (*Id.* ¶ 29.)

When February 19, 2014 arrived, although Plaintiff knew that Orlich would be absent and that she was going to have to provide "more details to start the investigation process," Plaintiff did not tell Maung and Leonard about the Incident. (*Id.*) Instead, after meeting for less than 15 minutes, Plaintiff said that she would wait until Orlich returned to describe what had happened to her. (*Id.*)[8]

---

[8] Plaintiff claims that the purpose of this meeting never was for her to talk about the Incident with Maung and Leonard. (*Id.* ¶ 29.) Plaintiff also claims that around this time, she asked two friends to tell Orlich to make the necessary arrangements with the Assistant Dean so that Plaintiff's professors would know about her situation and adjust for her. (*Id.*) The record is does not show that these individuals ever reached out to Orlich or the Assistant Dean. (*Id.*)

### F. Plaintiff's Official Statement to UPD

On February 13, 2014, Plaintiff again met with UPD to give them an official statement. (*Id.* ¶ 32). Plaintiff's VIBS advocate, Lori Thompson, arranged the meeting with UPD and was present the entire time. (*Id.*) Plaintiff described what had happened to her regarding the Incident, and Detective Corbisiero followed up with questions and typed up the statement, which Plaintiff reviewed and signed. (*Id.*)

Plaintiff then completed another Options Form and this time initialed Option 5, reflecting that she was choosing "to document the incident that has occurred, but ha[s] decided to not pursue further actions." (*Id.* ¶ 33.) She again initialed the second page, acknowledging that she had "been advised of the available counseling service afforded by the University." (*Id.*) After meeting with Plaintiff on February 13, 2014, Detective Corbisiero made an entry in the UPD "Investigative Leads Report," stating: "Sarah again stressed that at this point she only wished to make a statement, but wants no further action to be taken by anyone. She does not want to move forward with prosecution. She does not want the District [sic] Attorney's Office notified and she does not want any information to be shared with Community Standards/Student Affairs. Case will be closed by investigation unless Sarah re-contacts and wants something else to be done." (*Id.* ¶ 34.)

### G. Stony Brook's Investigation Process

In 2014, Stony Brook's Title IX Coordinator was responsible for overseeing an investigation involving a complaint of sexual assault, but was not necessarily responsible for independently performing the investigation. (*Id.* ¶ 35.) Hence, if Stony Brook received a complaint involving an allegation of sexual assault of a student by another student, UCS, not the Title IX Coordinator, took the lead in investigating it. (*Id.*) Further, the investigation would be handled

differently than a student complaining about an employee. (*Id.*) Because Plaintiff's allegation was against a student, Orlich, the UCS Director, lead the investigation. (*Id.* ¶ 36.)[9]

On February 24, 2014, Plaintiff and her friend Cassandra DeFelice ("DeFelice") met with Orlich and Leonard at the UCS conference room for a second "intake" meeting. (*Id.* ¶ 37.) At the meeting, Orlich and Leonard described what each of their offices did, advised Plaintiff of her Title IX rights, explained the investigative process, and explained how Stony Brook adjudicated Student Conduct Code violations. (*Id.*) They then gave Plaintiff the opportunity to tell them about the Incident, which she availed. (*Id.*) Orlich then stated that the next step would be to start the investigation and interview witnesses. (*Id.*) Subsequently, Orlich sent a letter to one of Plaintiff's professors, explaining Plaintiff's absence from class due to the meeting. (*Id.* ¶ 40.)

Three days later, Plaintiff began counseling sessions with Smita Majumdar- Das ("Dr. Das"), a therapist employed by SBU. During the first therapy session, Plaintiff described her experience at the February 24th meeting as "positive." (*Id.* ¶ 41.) Plaintiff complained, however, that, "she did not get the letter that [Orlich] promised [to her professor] on Monday (*Id.*).

**H. Meetings with Verdejo and Witnesses**

On February 27, 2014, Orlich and Leonard met with Verdejo to discuss the Incident. (*Id.* ¶ 42.) They informed Verdejo an allegation of sexual assault had been made against him, that they had an obligation to investigate it, and that this was his opportunity to state what he thought transpired. (*Id.*) Verdejo did so. (*Id.*) During the meeting, out of a concern for Plaintiff's safety, Orlich asked Verdejo about the activities and groups in which he was involved on campus so that she could assess whether and to what extent Plaintiff and Verdejo might interact on campus in the

---

[9] The reason that student-on-student investigations are handled differently from teacher-on-student or other hostile environment allegations, is that the Student Conduct Code governs the procedures for adjudicating allegations that the Code has been violated. (Def. Resp. to Pl. 56.1 ¶ 91; Dep. of M. Leonard, ECF No. 95, 44:3-10.)

future. (*Id.* ¶ 43.) Orlich then gave Verdejo a "no contact" directive, which stated that "[i]t was reported and it is alleged that you violated the Stony Brook University's Sexual Misconduct Policy" and, "[a]s a result of this matter, you are directed not to have any personal, verbal, electronic (email, instant message, text messaging), written, phone, cell phone, or third party contact with [Plaintiff]." (*Id.* ¶ 44.)

Between February 27, 2014 and March 13, 2014, Orlich interviewed four other witnesses suggested by Plaintiff and Verdejo. (*Id.* ¶ 45.) One witness was Darhiel DeLeon, Plaintiff's friend who had invited her to the party she attended on January 25- 26, 2014. (*Id.*) Orlich also obtained a videotape of Plaintiff and Verdejo entering Verdejo's dorm building on January 26, 2014 (*Id.*)

### I. Plaintiff's Ambivalence About the Hearing

On Friday, March 14, 2014, Orlich met with Plaintiff again to discuss whether she wanted to move forward with the disciplinary process against Verdejo. (*Id.* ¶ 46.) Plaintiff expressed concerns about what role she would take at the Hearing and whether she would have to be in the same room with Verdejo. (*Id.*) Plaintiff also asked Orlich to interview one more witness, her friend Danny Lall, which Orlich did soon thereafter. (*Id.*) At the end of the meeting, Orlich stated that she would contact Plaintiff again to determine whether Plaintiff wanted to move forward with the disciplinary process against Verdejo. (*Id.*)

Plaintiff had another therapy session with Dr. Das on April 3, 2014. (*Id.* ¶ 48.) At that session, she expressed "ambivalence" about whether she wanted to go ahead with the Hearing, stating that she "didn't want to deal with this any longer" and that she was feeling emotionally pressured by her own desire to go ahead, by her friends and family wanting her to go ahead, and her own desire not to go ahead. (*Id.*)

On Friday, April 11, 2014, Orlich met with Plaintiff a third time. (*Id.* ¶ 49.) The parties dispute the precise purpose of the meeting. (*Id.*) University Defendants claim that it was to determine whether Plaintiff wanted to proceed with the disciplinary process against Verdejo and, if so, in what way Plaintiff wanted to participate. (*Id.*) Plaintiff claims that she had already indicated that she wanted to go ahead with the disciplinary process and the purpose of the meeting was only to determine what role Plaintiff would play in it. (*Id.*)

The Hearing was not scheduled during that meeting with Orlich; rather, Orlich asked Plaintiff to send her an e-mail by the close of business on Monday, April 14, 2014, indicating whether Plaintiff wanted to proceed or not. (*Id.* ¶ 49.) When Plaintiff met with Dr. Das later that day, Plaintiff told Dr. Das that she had learnt what the process would be "if she went ahead with the Hearing." (*Id.* ¶ 51.) Two days later, Plaintiff exchanged texts with Lall, in which Lall stated: "Your getting anxious about the decision?" Plaintiff responded: "I kinna know my decision[.] it's everything encompassed with it[.] I have to select witnesses collect things I've written and then the Hearing itself." Lall responded: "Oh, that does sound stressful." (*Id.* ¶ 52.) On April 14, 2014, Plaintiff e-mailed Orlich, stating: "I would like to proceed." (*Id.* ¶ 53.)

### J. Stony Brook Arranges Hearing and Issues Interim Suspension to Verdejo

At Stony Brook in 2014, in Title IX cases where the respondent was a student, a Hearing board made the determination as to whether a violation of the Student Conduct Code had occurred. (*Id.* ¶ 54.) Once Plaintiff advised UCS that she wanted to proceed, UCS began taking the steps necessary to schedule the disciplinary Hearing, including preparing and issuing charges to Verdejo; assigning Plaintiff an advisor; selecting officers, and scheduling a date. (*Id.* ¶ 55.)

Orlich recommended that Dr. Suzanne Velazquez, one of Plaintiff's professors and Plaintiff's Program Director, act as Plaintiff's Advisor. (*Id.* ¶ 56.) Velazquez had previous

experience serving as a Hearing board member and as a Hearing officer in connection with Stony Brook student disciplinary proceedings, and had received training in order to be a Hearing board member. (*Id.*)[10] On April 21, 2014, Plaintiff met Velazquez and asked her to be Plaintiff's Advisor. (*Id.* ¶ 57.) Velaquez agreed. (*Id.*)

By letter dated April 23, 2014, Stony Brook's Vice President for Student Affairs, issued an Interim Suspension, suspending Verdejo "immediately from the Stony Brook University campus" until the charges issued against him "are heard through the conduct process." (*Id.* ¶ 58.) UCS then advised Verdejo that he was in alleged violation of the University Student Conduct Code and directed him to appear at an Administrative Hearing on Wednesday, May 7, 2014 if he wished to contest the charges. (*Id.* ¶ 59.) On April 25, 2014, Verdejo appealed the Interim Suspension, which was subsequently modified. (*Id.* ¶ 60.) Consequently, Verdejo was allowed to return to his residence hall and resume classes to complete his spring 2014 semester, but still had to abide by the "no contact" directive. (*Id.*)

On May 5, 2014, UCS rescheduled the disciplinary proceeding that had been scheduled for May 7, 2014, for May 16, 2014 (*Id.* ¶ 61.) Between May 5, 2014 and May 15, 2014, Sandee Maung, the Assistant Director of UCS, twice met with Plaintiff and Velazquez to prepare for the Hearing. (*Id.* ¶ 62.) On May 15, 2014, Plaintiff and Velazquez met with Dean of Students, Jerrold Stein, and Plaintiff requested that her therapist, Dr. Das, be permitted in the Hearing room during the Hearing. (*Id.* ¶ 63.) Later that day, Stein informed Velazquez that under the Student Conduct Code, Dr. Das would be permitted in UCS's suite of offices "to support [Plaintiff] outside of the Hearing room" during breaks, but could not be present inside the room. (*Id.*)

---

[10] Plaintiff asserts that that Dr. Velazquez had never served as a Hearing board member or officer in a case that involved Title IX allegations. (*Id.* ¶ 59.)

Dr. Das and Plaintiff discussed Plaintiff's request that Dr. Das be present in the Hearing room during the Hearing. (*Id.* ¶ 64.) Dr. Das told Plaintiff that she could have chosen her as an advisor to be present inside the Hearing room, but Plaintiff had already chosen a different advisor. (*Id.*) Plaintiff told Dr. Das that she was "happy" with Professor Velazquez as her advisor, but she wanted Dr. Das "to be around" because she was worried about her freezing or feeling anxious during the Hearing. (*Id.*) Dr. Das therefore obtained permission to be present in UCS's suite of offices to "support" Plaintiff during breaks in the disciplinary Hearing against Verdejo. (*Id.*) According to Dr. Das's May 15, 2014 psychotherapy note, Plaintiff was "somewhat comforted to know that [Dr. Das] will in the waiting area right outside the [Hearing] room and she can access [Dr. Das] for support during the Hearing." (*Id.*)[11]

### K. The Disciplinary Hearing

UCS arranged for Joseph Vece, then Stony Brook's Residential Community Standards Coordinator, and two students, Rachel Silver and Christina Leung, to act as Hearing board members for the disciplinary Hearing (the "Hearing"). (*Id.* ¶ 66.) Stony Brook students, faculty and staff were required to attend training before they could serve as Student Conduct Code Hearing board members. (*Id.* ¶ 67.) In 2013-14, Dr. Das, Maung and Vece gave the training to students, faculty, and staff, which included, a review of relevant provisions of the Student Conduct Code— including provisions dealing with sexual misconduct, the process of analyzing evidence presented during a disciplinary proceeding and rendering a finding based on that evidence, and information about sexual violence and the neurobiology of trauma. (*Id.*)

---

[11] The Parties dispute whether Dr. Das has been allowed to sit in on Hearings in other sexual assault situations and whether she told Plaintiff that she had been allowed. (*Id.* ¶65.) Dr. Das testified that she never told Plaintiff that she had sat in on a sexual assault Hearing. (*Id.*) (citing Das Dep. At 105:22-106:24, Ex. 23 to Klein Decl., ECF No. 82.)

The Hearing took place on May 16, 2014. (*Id.* ¶ 68.) When the Notice of Charges was read, Verdejo pleaded "Not Responsible" to the charges relating to Offenses Against Persons, Sexual Harassment and Sexual Abuse and/or Assault. (*Id.*) Verdejo pleaded "Responsible" to the last Charge, relating to "Alcoholic Beverages." (*Id.*) Plaintiff gave opening and closing statements and presented written evidence and two additional witnesses; Verdejo gave opening and closing statements and presented one additional witness, Darhiel DeLeon. (*Id.* ¶ 69.)

After the conclusion of the Hearing, the Hearing Board found Verdejo "Not Responsible" on the Charges to which he pleaded. (*Id.* ¶ 70.) On May 22, 2014, Orlich met with Plaintiff and relayed that Verdejo was found not responsible on the sexual misconduct Charges. (*Id.*) Orlich also told Plaintiff that, although that was the Hearing Board's determination, that did not mean that the incident did not happen. (*Id.*) UCS then prepared a written disposition reflecting the Board's determination. (*Id.* ¶ 71.)

## L. Plaintiff Graduates, Continues Counseling, and Appeals

Plaintiff graduated in May 2014, *magna cum laude,* with a dual degree in Social Welfare and Hispanic Languages and Literature. (*Id.* ¶ 72.) She maintained a 4.0 grade point average the second semester of her senior year. (*Id.* ¶ 73.) At the end of the semester, Dr. Das spoke with Plaintiff's supervisor to get an "exception" and permit her to continue to provide therapy to Plaintiff after she graduated. (*Id.* ¶ 74.) The school granted permission, and Dr. Das continued to provide therapy to plaintiff into the summer of 2014. (*Id.*)

On July 17, 2014, Plaintiff appealed the Hearing Disposition. (*Id.* ¶ 75.) On August 28, 2014, the Appeals Officer, James Souza, who had not previously served as an appeals officer, determined that "a significant procedural error occurred during the Hearing" because he found "no

14

evidence that the Hearing Board considered the definition of "consent" found in the University Student Conduct Code and/or applied that definition to the facts of the case." (*Id.* ¶ 76.)

After Souza's determination, the Hearing Board members, including one who had already graduated, twice re-convened (on September 25, 2014 and December 12, 2014) to re-consider the case. (*Id.* ¶ 77.) Orlich required the Hearing Board members to reconvene the second time after determining that they had not listened to the audio recording of the Hearing on September 25, 2014. (*Id.*) When they convened on December 12, 2014, Orlich instructed the Board members to be sure they applied the definition of "consent" in the Student Conduct Code. (*Id.*)

The Hearing Board nevertheless adhered to its original determination. (*Id.* ¶ 78.) Accordingly, UCS issued a written disposition, dated March 6, 2015, reflecting that the Hearing Board "confirms that it did consider the Code's definition of consent in its July 9, 2014 determination and affirms its prior determination." (*Id.*) The March 6th Disposition also noted that, although Souza had "review[ed] the evidence and the Hearing audio recording, he was not privy to the Hearing board's deliberations." (*Id.*)

### M. Stony Brook's Compliance with the Voluntary Resolution Agreement

In December 2010, the U.S. Department of Education, Office for Civil Rights ("OCR"), initiated a compliance review of the State University of New York under Title IX. (*Id.* ¶ 79; *see* Weddle Decl., Letter from OCR to Dr. Nancy L. Zimpher ("October Letter"), Ex. HH, ECF No. 95.) OCR's investigation included a review of documents submitted by SUNY system-wide administrative offices and four specific SUNY campuses (SUNY at Albany, SUNY-Buffalo State College, SUNY-Mo1Tisville State College and SUNY at New Paltz). The investigation did not specifically review Stony Brook. (Pl. 56.1 ¶ 79.)

In the October Letter, OCR detailed its findings and set forth the general terms of the Voluntary Resolution Agreement to be implemented by SUNY. (*Id.* ¶ 80.) OCR also explained that although its review "concerned all state-operated campuses of SUNY, OCR conducted on-sites" only at the four previously-referenced campuses. (*Id.*) Based on the review of system-wide procedures and procedures at those four campuses, OCR found compliance concerns for all SUNY schools in three areas: Title IX Coordinators and Notices of Nondiscrimination; Grievance Procedures; and Campus Climate. (*Id.*)

On September 30, 2013, SUNY and OCR entered into a Voluntary Resolution Agreement.[12] (Weddle Decl., Ex. II, ("Voluntary Agreement"), ECF No. 95.) This Agreement detailed the actions SUNY would take, and the dates by which such actions would be taken, pursuant to the requirements of Title IX and its implementing regulations. (*Id.*) The actions to be implemented touched various policies, including but not limited to revising grievance procedures, addressing complaints of sexual assault/violence, Title IX training for individuals involved with recognizing/reporting incidents of sexual assault/violence, and documentation regarding complaints of sexual assault/violence. (*Id.*)

Stony Brook reports to have complied with its obligations with respect to the Voluntary Resolution Agreement each and every year since OCR and SUNY entered into that Agreement. (Pl. 56.1 ¶ 81.)[13] In line with its obligations, Stony Brook issued its Annual Security Report for 2014, which includes "statistics for reportable crimes that are confidentially reported," regardless of any determination of responsibility. (*Id.* ¶ 83.) With respect to the portion of the

---

[12] As Stony Brook notes, the Voluntary Resolution Agreement did not constitute an admission by SUNY that it was not in compliance with Title IX and/or the implementing regulations. (*Id.* ¶ 81.)

[13] Plaintiff claims that the one exception to Stony Brook's compliance was a December 31, 2013 deadline to provide proof of Title IX training already provided. (*Id.* ¶ 82.) Further, she claims that Stony Brook's obligations were supposed to be implemented after January 26, 2014, the date Plaintiff was sexually assaulted. (*Id.*)

Report regarding "forcible sex- offenses" on Stony Brook's campus (consisting of the categories "rape," "fondling," "incest" and "statutory rape") there were 13 reported incidents in 2011, 17 reported incidents in 2012, and 12 reported incidents in 2013. (*Id.* ¶ 83.) Plaintiff contends that Stony Brook historically underreports offenses by as much as 48%. (*Id.*)

Having chronicled the context of the Incident, Plaintiff's pursuit of redress, and Stony Brook's investigation, the Court now turns to the legal issues in this dispute.

## II. STANDARD OF REVIEW

### A. Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," *see* Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013)

(summary order). Courts must "draw all rational inferences in the non-movant's favor," while reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Importantly, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250. Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

Critically, in an opposition to a motion for summary judgment "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

## III. LEGAL LANDSCAPE

At the heart of the parties' dispute about University Defendants' adequate grievance process is a fundamental disagreement over the prevailing legal standards. Accordingly, this Court explains the full legal landscape governing Title IX and sexual harassment.

### A. Sexual Harassment under Title IX

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance." 20 U.S.C. S 1681 (a). When Title IX was introduced, as an amendment to the Education Amendments of 1971, it was designed to mirror and fill the gap of the Civil Rights Act and ensure that educational opportunities not be based on sex. *See* Amend. 398, 117 Cong. Rec. 30 156 (1971);117 Cong. Rec. 30, 406-07 (1971) ("educational opportunity should not be based on sex, just as we earlier said it should not be based on race, national origin, or some of the other discriminations.") (Senator Birch Bayh).[14]

Because the ultimate purpose of Title IX is to prohibit sex discrimination at all levels of education, the Act proscribes discrimination in three ways: (1) no one may be excluded from participation in any educational program or activity; (2) no one may be denied the benefits of any education program or activity; and (3) no one may be subjected to discrimination under any education program or activity. 20 U.S.C. S 1681 (a).

The Act indirectly prohibits sexual harassment on the basis that harassment can be a form of sex discrimination when it leads to a hostile environment, which then impedes one's access to the benefits of an educational program. Accordingly, a school may be liable for sexual harassment if it allows a hostile environment to persist—that is, when a school knows about severe or pervasive harassment and fails to immediately take steps to quell it. Because a school's liability under Title IX hinges on pervasive enough harassment to create a hostile environment that endangers educational opportunities and a deliberate failure to mitigate the situation, it is a high bar for a school to be liable for student-on-student harassment.

---

[14] Title IX was modelled on the Civil Rights Act of 1964, which provided that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, of be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000(d) (2011). The language in the two statutes is virtually identical, except that the Civil Rights Act of 1964 did not specifically reference sex.

The Supreme Court explained the "limited circumstances" in which a recipient of federal funding can be liable for discrimination arising out of student-on-student harassment in *Davis v. Monroe County*, 526 U.S. 629, 644-45, 119 S. Ct. 1661 (1999). There, it laid out three elements that are needed for a plaintiff to demonstrate a prima facie case of student-on-student sexual harassment: (1) The alleged harassment was so "severe, pervasive, and objectively offensive" that it deprived the plaintiff of "access to the education opportunities or benefits provided by the school"; (2) the funding recipient had "actual knowledge" of the sexual harassment and (3) the funding recipient was "deliberately indifferent to the harassment." *Id.* at 642-43.

Hence, an educational institution can be liable on a deliberate indifference theory only when its response to known harassment is "clearly unreasonable." *Id.* at 648. On a summary judgment, a court is entitled to decide that the educational entity's response was "not clearly unreasonable" as a matter of law. *Id.*

### B. Agency Guidance on Title IX and Sexual Harassment

In order to help clarify the application of Title IX to instances of sexual harassment, the Department of Education Office of Civil Rights ("OCR") published an important guide in 1997, entitled "Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties," ("First Guidance"), 62 FR 12034 (1997).[15] The First Guidance explained that "[s]exual harassment can be a form of discrimination prohibited by Title IX" and that schools must have policies and procedures in place that provide for "a prompt and equitable procedure for resolving sex discrimination complaints." *Id.*

The First Guidance "offer[ed] school personnel *flexibility* in how to respond to sexual harassment" and relied "on school employees and officials *to use their judgment and common*

---

[15] https://www.gpo.gov/fdsys/pkg/FR-1997-03-13/pdf/97-6373.pdf.

*sense*[.]" *Id.* (emphases added.) It went so far as to state that "[c]commentators who read the Guidance as always requiring schools to punish the alleged harassment under an explicit sexual harassment policy, rather than by use of a general disciplinary or behavior code ... are *incorrect*." *Id.* (emphasis added.)

The Guidance added that "Title IX permits the use of a general student disciplinary procedure ... that a school could reasonably be expected to take" and that it believes "is effective in ending the sexual harassment and in preventing its recurrence." *Id.* The Guidance emphasized that the goal of a school, particularly with student-on-student sexual harassment, as compared to the broader category quid pro quo sexual harassment and for hostile environment sexual harassment, is to "prevent[] it from escalating." *Id.* Hence, the First Guidance stated that "it is impossible to provide hard and fast rules applicable to all instances of sexual harassment" and instead it provided "factors to help schools make appropriate judgments." *Id.*

The First Guidance has remained the foundation of the OCR's subsequent letters. At the time of Plaintiff's complaint, the operative Guidance was from 2001 and a complementary letter the OCR issued in 2011. ("2011 Dear Colleague Letter", ("DCL"), Weddle Decl., Ex. LL, ECF No. 95.) The DCL laid out additional guidelines to help educational institutions comply with Title IX requirements. For example, the DCL requires schools to "publish a notice of nondiscrimination and to adopt and publish grievance procedures." (*Id.* at 4.) It also states that, regardless of who files a complaint, once a school knows, or reasonably should know, about possible harassment, it has an "*independent* Title IX obligation to investigate the conduct"—that is, to "promptly investigate to determine what occurred and then take appropriate steps to resolve the situation." (*Id.*) (emphasis added.)

In line with the First Guidance, the DCL maintains that "the investigation will vary depending upon the nature of the allegations, the age of the student...the size and administrative structure of the school, and other factors." While it emphasizes that the school's inquiry "must in all cases be prompt, thorough and impartial," it also explains that where the complainant is not providing consent, or requests confidentiality, the school need only take "reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality or request not to pursue an investigation." (*Id.* at 5.)

Whilst the DCL adds clarity to previous guidance, it maintains that a school's independent obligation to investigate Title IX complaints is tempered by the context of a situation. Hence, it lists factors, such as "the seriousness of the alleged harassment; the complainant's age; whether there have been other harassment complaints about the same individual; and the harassers rights to receive information maintained by the school." And it still defers to schools to decide the commensurate response to allegations, in light of the complainants' requests for urgency or confidentiality. Moreover, the DCL makes clear that the ultimate purpose of the investigation is tethered to the ultimate purpose of Title IX—to ensure that known instances of harassment do not barricade educational opportunities under the nose of federally-funded educational institutions.

The significance of the DCL is that it provides some, albeit opaque, guidelines to help educational institutions comply with Title IX. Importantly, it does not create a basis for civil damages under Title IX. *See Moore v. Regents of the Univ. of Cal.* No. 15–cv–5779, 2016 WL 2961984, at *5 (N.D. Cal. May 23, 2016) ("There is no private right of action to recover damages under Title IX for violations of DOE's administrative requirements, much less the provisions of the DCL and Q&As, which are agency guidance documents."); *Doe v. Forest Hills Sch. Dist.*, No. 1:13–cv–428, 2015 WL 9906260, at *10 (W.D. Mich. Mar. 31, 2015) ("Although failure to comply

with Title IX guidance does not, on its own, constitute deliberate indifference, it is one consideration."); *Bleiler v. Coll. of Holy Cross*, No. 11–cv–11541, 2013 WL 4714340, at *5 (D. Mass. Aug. 26, 2013) (noting that the guidance in the DCL "does not have independent force of law but informs this Court's evaluation of whether the College's procedures were 'equitable'").

Accordingly, the DCL cannot be this Court's sole basis for finding Title IX liability. Rather, it serves as a helpful barometer for assessing whether, under the circumstances of Plaintiff's situation, a reasonable jury could find that University Defendants were "clearly unreasonable."

## IV. DISCUSSION

At the onset, it is undisputed that University Defendants receive Federal Financial assistance. Further, at this juncture, Defendants raise no issue with the other *Davis* elements (whether the alleged harassment was sufficiently severe to deprive the plaintiff of access to educational opportunities and whether the school had actual knowledge of the harassment). To defeat summary judgment, , however, they need only prevail one of the three elements. Consequently, the only issue before this Court therefore is whether, under governing interpretations of Title IX, the record could permit finding that the University Defendants were deliberately indifferent.

University Defendants move for summary judgment on two grounds. First, they claim that the undisputed evidence demonstrates that they did not act with deliberate indifference in response to Plaintiff's sexual harassment claim. (Defendants' Memorandum in Support of Summary Judgment, ("Def. Mem."), at 17-25.) Second, they claim that the undisputed evidence demonstrates that there is no factual or legal basis for Plaintiff's pre-assault Title IX claim. (*Id.* at 24-29.) For the reasons discussed below, the Court agrees with University Defendants.

## A. Deliberate Indifference

The deliberate indifference standard set forth in *Davis*, 526 U.S. 629, set a high bar for plaintiffs to recover under Title IX. Again, it requires only that school administrators respond to known peer harassment in a manner that is not "clearly unreasonable in light of the known circumstances." *Id.* at 648. The standard is not mere reasonableness, negligence or carelessness; it requires recklessness. The Supreme Court emphasized in *Davis* that federal funding recipients need not "purge their schools of actionable peer harassment" or "engage in a particular disciplinary action to avoid Title IX liability." *Id.* Further, Title IX does not give victims a right to "make particular remedial demands." *Id.*

To avoid Title IX liability, then, an institution is not required "to ensure that … students conform their conduct to certain rules." *Id.* at 648-49. Rather, damages are available under Title IX only if "an individual who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of the discrimination … and fails to adequately respond." *Gebser v. Lago Vista Independent School District*, 524, U.S. 274, 290, 118 S.Ct. 1989 (1998).

University Defendants contend that the undisputed evidence demonstrates that they did not act with deliberate indifference before, during, or after the Hearing. (Def. Mem. at 19-21.) They also contend that they did not act with deliberate indifference with regards to a number of specific instances that the Court listed as potential examples of deliberate indifference in its prior Order. (*Id.*; *See* Opinion and Order, ("Last Order"), ECF No. 52 at 13-14.) Plaintiff asserts that University Defendants did act with deliberate indifference throughout the investigation, and additionally lists examples and policies that demonstrate the alleged indifference. (Plaintiff's Memorandum in Opposition to Summary Judgment, ("Pl. Mem."), at 12 -20.)

### 1. Promptness During the Investigation

Plaintiff first contends the University Defendants demonstrated deliberate indifference by failing to investigate and provide Plaintiff with a "prompt and equitable resolution" of her complaint of sexual assault. (Pl. Mem. at 12.) She argues that the "prompt and equitable" requirement is imposed by the 2011 DCL, which states that 60 days from the date of the complaint is a reasonable time to complete an investigation and determination. (*Id.*).

### a. "Prompt and Equitable" DCL Guidance

With regards to requiring an investigation and grievance procedure to be prompt and equitable, the DCL only requires that schools provide:

> Notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed; Application of the procedures to complaints alleging harassment carried out by employees, other students, or third parties; Adequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence; Designated and reasonably prompt time frames for the major stages of the complaint process; Notice to parties of the outcome of the complaint; An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

*Id.* In addition, the suggestions for timing include that:

> Grievance procedures should specify the time frame within which: (1) the school will conduct a full investigation of the complaint; (2) both parties receive a response regarding the outcome of the complaint; and (3) the parties may file an appeal, if applicable.

*Id.* Hence, the guidance is quite bare and does not impose a hard and fast time frame for schools to complete investigations. Rather, it focuses on school's providing students ample notice of the available procedures, general promptness, and general fairness throughout the process. In line with the First Guidance, the DCL allows discretion and defers to educational institutions' judgment.

Further, as Plaintiff notes, the DCL states that "[b]ased on OCR experience, a typical investigation takes approximately 60 calendar days following receipt of the complaint." *Id.* But again, the DCL does not mandate that Investigations be completed in that time frame. On the contrary, the DCL continually provides "best practices," but then emphasizes flexibility and proportionality: "[w]hether OCR considers complaint resolutions to be timely, however, will vary depending on the complexity of the investigation and the severity and extent of the harassment."

### b. "Lengthy and Unjustified" Delay

In interpreting the timing requirements for a Title IX investigation based on the statute itself, the Supreme Court, Second Circuit, and other Circuits have repeatedly held that delay may indicate deliberate indifference only when it is "lengthy and unjustified." *Hayut v. State Univ. of New York*, 352 F.3d 733 (2d Cir. 2003) (citing *Bruneau v. South Kortright Cent. Sch. Dist.*, 163 F.3d 749, 761 (2d Cir.1998)); *KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, 531 F. App'x 132, 134 (2d Cir. 2013) ("There is no charge here ... that the school unreasonably delayed its response or failed to prevent future harassment.")

In, *Hayut*, 352 F.3d 733, the Second Circuit upheld the district court's finding of no lengthy and unjustified delay in a teacher-on-student harassment case, where the harassing conduct occurred in Fall 1998, the student submitted a written complaint several months later in February 1999, and the harasser tendered his resignation in March of 1999. *Id.* at 741. Importantly, the Court did not focus on the total amount of time that elapsed since school officials first got wind of the harassing conduct; rather it focused on the promptness with which the school reacted to each meeting with the student. *Id.* at 752. *See also Oden v. N. Marianas Coll.*, 440 F.3d 1085 (9th Cir. 2006) (finding that college was not deliberately indifferent to alleged harassment, even though it failed to hold a hearing until following school year, in violation of its own policy because "[t]he

College began to act as soon as it became aware of Plaintiff's allegations" and "the record failed to demonstrate that the delay was more than negligent lazy or careless."); *Butters v. James Madison Univ.*, 208 F. Supp. 3d 745 (W.D. Va. 2016) (holding that university was not deliberately indifferent by requiring student to initiate formal complaint process before beginning investigation and disciplinary proceedings.)

A clear example of deliberate indifference due to a lengthy and prolonged delay was displayed in *Davis*, 526 U.S. at 633-34. Again, there, the Supreme Court held that the school could be liable for deliberate indifference when the harassment was part of a "prolonged pattern," which the school knew about for months due to complaints from parents and multiple victims, and the school did nothing to stop the harassment, even though the plaintiff's grades suffered and she contemplated suicide. *Id.* The Court now turns to the facts at hand.

### c. The Undisputed Facts

The Court finds that the undisputed facts demonstrate that the University Defendants responded promptly to Plaintiff's complaint. Immediately after being notified about Plaintiff's complaint on January 28, 2014, UPD officers drove Plaintiff and her friends to the campus police station for a meeting in which Plaintiff described her alleged assault. (*Supra* Part I.B.) At that meeting, the Detectives showed and discussed the Options Form with Plaintiff. (*Id.*) They then asked Plaintiff if she was interested in taking a SANE exam, and then drove Plaintiff and her friends to the hospital for the exam as well as back to her dormitory after the exam. (*Supra* Part I.C.) The next day, Detective Stumpf called the University Hospital to obtain results to the SANE exam. (*Id.*) The subsequent day, January 30, Plaintiff again met with Detective Corsibiero, who discussed the options and resources available to Plaintiff. (*Supra* Part I.D.) In mid-February,

Plaintiff again met with Detective Corsibiero to give him an official statement, and he again advised her of various options, including counseling and prosecuting the case. (*Supra* Part I.F.)

On January 30, when Plaintiff first discussed the Incident with her supervisor, Meera Cuevas, Cuevas informed Plaintiff that she would have to report the incident up, and did so immediately, thereby roping in UCS, the administrative department tasked with conducting Title IX investigations. (*Supra* Part I.D.) UCS reached out to Plaintiff the same day they received notice of the alleged harassment in order to schedule a time to meet and discuss the matter. (*Supra* Part I.E.) Though Plaintiff did not respond to that email, it was Cuevas who urged Plaintiff to set up a time to speak with Orlich at UCS about the matter, which Plaintiff subsequently did. (*Id.*) During that call, Orlich, who would then lead the investigation, relayed to Plaintiff further information about the investigation process and disciplinary Hearing. (*Id.*) Orlich then helped arrange for a subsequent "intake" meeting with Plaintiff and other UCS administrators. (*Id.*)

Towards the end of February, Plaintiff met UCS administrators for a second "intake" meeting, during which UCS relayed further details about the investigation and hearing process. (*Supra* Part I.G.) Around this time, Plaintiff began therapy sessions with, Dr. Das, a therapist employed by SBU. (*Id.*) Around this time, UCS also began to meet and discuss the Incident with Verdejo and issued him a "no-contact" directive. (*Supra* Part I.H.) Throughout March and April, Plaintiff continued to meet with UCS administrators and her therapist, who continued providing her with more information as she contemplated pursuing a hearing. (*Supra* Part I.H.)

Plaintiff finally decided, and put into writing, that she wanted a hearing on April 14, 2014. (*Id.*) Within 10 days of Plaintiff making her decision, SBU's Vice President for Student Affairs issued an Interim Suspension to Verdejo and advised him that there would be a hearing the following month. (*Supra* Part I.J.) That Hearing did, in fact, take place the following month, and

in the month leading up to the Hearing, University Defendants made all logistical and scheduling arrangements for the Hearing, including selecting and training a Hearing board. (*Supra* Part I.K.)

The Court finds that the undisputed facts show that the University Defendants were far from unreasonable in handling Plaintiff's complaint. Rather, they responded to Plaintiff's Complaint diligently and in accordance with all required procedures throughout the time leading up to the Hearing. UPD constantly tried to accommodate Plaintiff and her friends and listen to their accounts of the Incident, in as much detail as Plaintiff and her friends wanted to share. They provided information about pursuing a criminal investigation. They suggested that Plaintiff take the SANE exam and drove her and her friends to and from the hospital and Plaintiff's dormitory.

Similarly, UCS provided Plaintiff with ample notice about the grievance procedures and resources available to Plaintiff at SBU, satisfying its notice requirements. (*See supra* Part I.E., I.H., I.I.; Student Conduct Code 2013; Discrimination Complaint Procedure, Weddle Decl. Ex. F, ECF No. 95.) It also conducted an investigation,[16] through which it completed "intakes," (*supra* Part I.E-G; Weddle Decl., Ex. B, ("Orlich Dep.") at 194-195), interviewed around 6 witnesses, (Orlich Dep. at 197), gathered physical evidence (*supra* Part I.H) interviewed Verdejo, (*id.*), later issued charges and an interim suspension on Verdejo, (*supra* Part I.J), found Plaintiff an Advisor, (*id.*), discussed the Incident with Plaintiff and Defendant (*id.* at 195:9-15, 196), and met with Plaintiff and her Advisor to prepare for the Hearing, (*supra* Part I.J). Eventually, it also organized a disciplinary Hearing, (Weddle Decl., Ex. C, ("Orlich Dep.II") at 10), put together a Hearing board

---

[16] An email from Raul Sanchez, Title IX Coordinator on the day of the Incident shows that University Defendants knew about their independent Title IX obligations. It reads: "This is the kind of case that Community Standards needs to investigate. The young woman may not want to cooperate with such an investigation, too, but we have to make the effort Can I get the names and other details from you." (Weddle Dec. Ex. L, Email from Raul Sanchez, ECF, No. 95.)

(*supra* Part I.K), trained them (*id.*), and wrote and circulated written findings of the Hearing to Plaintiff (Weddle Decl., Ex W, ECF No. 95.)[17]

Accordingly, the Court finds that no reasonable juror could find that University Defendants, UPD, or UCS were "indifferent" to Plaintiff's complaint; rather they were all attentive.

### 2. Policies and Due Process Issues

With regards to the structure of the investigative process and Hearing, Plaintiff takes issue with a number of University Defendants' policies based on the Student Conduct Code and lack of "basic due process protections for complainants" pursuing hearings. (Pl. Mem. at 13). Therefore, the Court now addresses why no combination of Plaintiff's structural and procedural complaints could lead a reasonable juror to find that University Defendants acted clearly unreasonably.

### a. Misleading Timing Policies

Plaintiff first takes issue with the school's complaint-filing policy as represented in the January 2013 Student Conduct Code. (Weddle Decl., ("Code") Ex. E, ECF No. 95.)[18] She argues that the Code requires a student to file their complaint "within 30 days following the date of the incident giving rise to the complaint," whereas the 2011 Letter reflects that 60 days from the date of the complaint is a reasonable time to complete an investigation. (Pl. Mem. at 13.) She argues that "[t[his obvious mistake may lead a victim to believe that she has abandoned a Title claim by waiting 31 days... or may serve only to accelerate the feeling of confusion or self-doubt or hopelessness that plagues the victim, and lead to abandonment of the process altogether." (*Id.*)

---

[17] The undisputed facts reflect that Stony Brook's designated Title IX Coordinator was required to oversee but not necessarily personally conduct, the independent Title IX investigations. The investigations were carried out by UCS. (*See* Weddle Decl., Ex D, ("Leonard Dep.") ECF No. 95 at 37:17-25.)

[18] The parties do not dispute that this version of the Code applied when the Incident occurred and when Plaintiff sought redress. (Def. Resp. to Pl. 56.1 ¶ 85.)

The undisputed facts fail to support Plaintiff's argument. The language in the Code states that Complaints must be filed within 30 days "to *facilitate a timely investigation* and processing of complaints." (Code at 31.) The language is not absolute. It suggests that for the purpose of facilitating a timely investigation, a student must file a complaint within that window. The next sentence in the section permits exceptions based on the severity of the conduct. These provisions make sense, as the lack of a complaint would likely slow down an investigation, and the department can always make exceptions for late filings of serious complaints.

Moreover, Plaintiff is comparing apples and oranges. The Student Code and the DCL are referring to two different things. The Code is encouraging students to promptly *file their complaint* within 30 days of an incident, whereas the DCL is merely giving an example of the typical time in which schools *complete investigations* after a complaint is filed. Consequently, the school's policy does not contradict the DCL, but rather is designed to comply with the promptness requirements. Consequently, the Court finds that no reasonable juror could find that policy in the Code to reflect clear unreasonableness or deliberate indifference.

### b. Disciplinary Procedure Policies

Plaintiff next takes issue with structural policies related to the University Defendants' grievance procedure, specifically the Hearing process, which she argues is inequitable in several ways. She argues that the written policy allows a defendant to cross-examine a complainant's witnesses and evidence, but does not give the complainant the opportunity to confront respondent's witnesses (Pl. Mem. at 13-14). She adds that, if a complainant is allowed to cross examine respondent's witnesses, it only allows the complainant to prepare 48 hours in advance. (*Id.*) She similarly takes issue with the lack of access to evidence because the University does not allow agencies to share information with other departments or with parties to a complaint. (*Id.*)

31

Plaintiff argues that, due to these policies, "the deck was stacked against [her] from the beginning." (*Id.* at 17.) For example, she claims that she was kept in the dark with access to helpful evidence because neither her first nor second formal police statements were provided to the Title IX Coordinator, nor to UCS. (*Id.* at 16.) Similarly, she claims she was prejudicially deprived of the results of her SANE examination, which noted "bruising of Plaintiff's breasts and contain[ed] pictures" because they "remained in the police evidence locker until they were destroyed in August 2014." (*Id.*) She adds that she was "subjected to cross-examination by her assailant" which "indicates deliberate indifference to the well-being of a sexual assault victim." (*Id.* at 17.) And she claims that not being allowed to bring her therapist, when "[s]he would have been entitled to bring a service animal – a dog – into the Hearing" reflects deliberate indifference. (*Id.*)

At the onset, the Court finds the Code's grievance procedures only support some of Plaintiff's conclusory statements. For example, the Code permits the University Official presiding over the case to exclude all evidence that has not been shared, and it also provides that parties are only to be given the identity of witnesses who will be at the Hearing 48 hours in advance. (*See* Code at 21.) While Plaintiff attempts to argue that the procedures are one-sided and only allow a respondent to enjoy cross-examination, she points to no instance where that has been the case and only language that seems carelessly-worded at best. In her case, there is no dispute that she and Verdejo were both allowed to present their cases and question one another. (Def. Rep. Pl. 56.1 ¶179.)[19] It is also undisputed that UCS determined, pursuant to its authority in the Code, that Plaintiff could have her Advisor present within the Hearing, but not her therapist. (*Supra* Part I.J.)

Second, a cursory review of the DCL reflects that its requirements were largely being met. For example, the DCL discourages schools from requiring the student who complains of

---

[19] The parties dispute whether the form and indirectness of Verdejo questions could deem his questioning a "cross examination." (Def. Rep. Pl. 56.1 ¶179).

harassment to have to work out the problem directly with the alleged perpetrator "without appropriate involvement from the school." (DCL at 8.) Neither party contends that Plaintiff was forced to deal with Verdejo *without* school involvement. Additionally, the DCL requires that whatever rules of evidence apply, apply equally to the accuser and the accused. (*Id.* at 11-12). Here too, nothing in the record indicates that one party had greater access to evidence than the other. And similarly, the DCL provides that all persons involved in the grievance procedure must have experience *or training* related to handling complaints of sexual harassment and violence. Hence, Plaintiff's complaints about inexperienced individuals, such as her advisor Velazquez, do not stand muster, as the record reflects that all students, faculty, and staff involved in the disciplinary hearing were trained for the tasks with which they were charged. (*See supra* Part I.K.)

More importantly, however, the Court need not assess the factual validity behind each of Plaintiff's hearing-related complaints, as neither Title IX nor the DCL impose specific requirements on Universities regarding disciplinary Hearings. *See e.g. Butters,* 208 F. Supp. 3d at 762-63 ("…whether JMU could have designed a more victim-friendly system, whether if could have taken steps to protect Butters better, or even whether JMU followed its own policy to the letter, are not dispositive.")

In fact, the statute and DCL are ultimately silent as to: (1) whether the school must convene a judicial panel to hear such complaint; (2) whether the school must allow for a discovery process prior to a judicial panel to facilitate the exchange of evidence between parties; (3) who can sit on a judicial panel; (4) whether such a panel must include student representatives; (5) whether such a panel must have specific training or a particular background (6) what rules of evidence apply at the judicial Hearing; (7) whether the parties can bring an attorney or support person to the Hearing; (8) whether the survivor and the accused are entitled to present evidence and cross-examine each

other or each other's witnesses; (9) whether character witness testimony is allowed; (10) whether the losing party is entitled to an appeal, (11) if an appeal is allowed, the basis on which one may appeal; (12) what if any qualifications the appeal reviewer must have; (13) who can hear the appeal; (14) whether the appellate body will review both factual and legal questions, and 15) what standard of review will apply on appeal.[20]

Hence, the majority of Plaintiff's issues regarding the amount of evidence that was available to her, the nature of the direct and cross-examination, the limited amount of time that she had to prepare a cross-examination, the qualifications of Souza, who reviewed her appeal application, and the fact that she was not allowed to have her therapist in the Hearing room, are not mandatory. Further, Plaintiff cites no case law supporting that universities with similarly flawed Hearing procedures have been found liable under Title IX. Indeed, the DCL and case law advise courts to defer to schools' internal procedures, and to even pardon noncompliance, so long as schools otherwise demonstrate attentiveness to the issue. (*See* DCL at 9) ("procedures adopted by schools will vary in detail, specificity, and components"). *See also Gebser v. Lago Vista.*, 524 U.S. at 292 ("the failure to promulgate a grievance procedure does not itself constitute "discrimination" under Title IX."); *Doe v. Bd. of Educ. of Prince George's Cty.*, 605 F. App'x 159 (4th Cir. 2015) (holding that failure to follow sexual harassment grievance procedures "might be probative of negligence" but does not prove deliberate indifference under Title IX).

When school procedures do clash with suggestions in the DCL, district courts repeatedly hold that such disparities do not amount to deliberate indifference. *See e.g., Ross v. Univ. of Tulsa*,

---

[20] The DCL mentions some of these items, but only in general terms, not with hard requirements. For example, it neither encourages nor discourages character witnesses, but states that whatever rules for character witnesses and evidence apply, must apply equally to both sides. (DCL at 12.) Similarly, it states that the fact-finder and decision-maker should have training or knowledge regarding sexual violence, but nothing about what their backgrounds or training should be. Regarding appeals, it merely states that if appeals are permitted, the parties must know. (*Id.*)

180 F. Supp. 3d 951 (N.D. Okla. 2016), *aff'd*, 859 F.3d 1280 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 1267, 200 L. Ed. 2d 418 (2018) (holding that failing to follow "best practices," "past practices," or the DCL does not render a university's response deliberately indifferent); *Karasek v. Regents of the Univ. of Cal.*, No. 15–cv–3717, 2016 WL 4036104, at *11 (N.D. Cal. July 28, 2016) ("Failure to adhere to the DCL may be bad policy, but standing alone it does not constitute deliberate indifference."); *Butters v. James Madison Univ.*, 208 F. Supp. 3d 745, 757 (W.D. Va. 2016) (explaining that "a school's compliance or non-compliance with the DCL can be a factor that the court considers"); *Moore v. Regents.*, 2016 WL 2961984, at *5 (rejecting as "misguided" the plaintiff's argument that the court should defer to guidance such as the DCL letter in deciding whether a university's actions amount to deliberate indifference.)

Here, the undisputed evidence showed that SBU met its notice requirements, conducted a pre-Hearing investigation, and arranged for a Hearing in which both sides were able to present witnesses, offer evidence, read opening and closing statements, and question one another before a body of fact-finders, who received specific training. (*Supra* Part I.K.) Although the grievance procedure may have been flawed and imperfect, such as with allowing Verdejo to, in some manner, question Plaintiff at the Hearing, no reasonable juror could find that University Defendants violated their barebones Title IX obligations. *See Davis*, 526 U.S. at 648 ("courts should refrain from second-guessing the disciplinary decisions made by school administrators.") (citation omitted); *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 848 (6th Cir. 2016) (same).

The law in this area steadily holds that a school's response is not clearly unreasonable "simply because the victim … advocated for stronger remedial measures." *S.B. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016); *Doe v. Bd. of Educ.*, 982 F.Supp.2d at 657 (explaining that Title IX plaintiffs lack the "right to make particular remedial demands") (quoting

*Davis*, 526 U.S. at 648); *KF.*, 531 Fed.Appx. at 134 (affirming dismissal of Title IX claim of deliberate indifference where school offered remedies that parents disliked); *Kelly v. Yale Univ.*, No. 3:01-cv-1591, 2003 WL 1563424, *4 (D.Conn. Mar. 26, 2003) (holding that a "victim of peer harassment does not have the right to any particular remedial demand, immediate expulsion of her alleged harasser, or a remedy that would expose the school to a constitutional or statutory claim on the part of the accused....") (citing *Davis*, 526 U.S. at 648); *Butters*, 208 F. Supp. 3d at 762-63 (dismissing plaintiff's complaints that during disciplinary hearings, she was able to see the assailant.) Although the Court is sympathetic to Plaintiff's difficulties, unfortunately, the law in this area repeatedly sings the same tune: "You can't always get what you want."

### c. Appeals Process

Lastly, Plaintiff takes issue with the appeals process. She argues that "because UCS failed to provide the appeals officer with the proper form... the decision on re-Hearing was not sent to Plaintiff until March 6, 2015, nearly three months after the decision had been made, and over six months after the appeal had been decided in [her] favor." She claims that getting a final disposition more than 14 months after she reported the assault was "arguably unreasonable." (Pl. Mem. at 15).

The Court addresses this last point briefly as the majority of arguments regarding promptness and procedural deficiencies have already been addressed in the preceding sections. First, it finds that ample case law shows that such delays are not unreasonable enough to invite Title IX liability. *See e.g., Oden*, 440 F.3d 1085 (finding no deliberate indifference where school failed to hold Hearing until following school year, in violation of its own policy, but evidence showed that delay was either negligence, laziness, or carelessness); *Butters*, 208 F. Supp. 3d 745 (holding that university was not deliberately indifferent in starting investigation once student filed formal complaint after months of ambivalence). Second, much like in *Butters*, here the delay was,

in part, due to Plaintiff's decisions – initially, her ambivalence in filing a complaint and pursuing a hearing, and later, her pursuit of an appeal.[21]

As the Court stated in its Last Order, it is not admonishing Plaintiff for her understandable hesitance, nor is it pardoning any of SBU's lack of independent diligence that could be attributable to her. (*See* Last Order, note 6.) Rather, it mentions Plaintiff's repeated ambivalence as relevant context to show why the University Defendant's delay in rendering a final disposition was reasonable, if not necessary. Not only was UCS unable to schedule a formal hearing until Plaintiff consented to doing it, but also, the appeals process required re-convening the Hearing board, including students who had already graduated, as well as reviewing procedures, evidence, and facts that had become stale. (*Supra* Part I.L.) And finally, the Court notes, Plaintiff was not entitled to an appeals process under Title IX or the DCA. That she was able to avail the benefit of appellate review is actually a testament to University Defendants' attentiveness.

Accordingly, the Court finds that no reasonable juror could find that the delay in Plaintiff receiving the disposition was deliberately indifferent, clearly unreasonable, or reckless—either in isolation or in combination with the rest of the University Defendants' conduct. And none of the other scattered complaints Plaintiff makes come anywhere close to reflecting recklessness.

---

[21] For example, on January 26, 2014, after taking her SANE exam, Plaintiff told UPD that she "wish[ed] to remain anonymous at this time, and would like no action to be taken by the university at this time." (*See supra* Part I.C.) On January 29, 2014, after meeting with a rape crisis advocate at VIBS, Plaintiff "indicated not to release the SANE documentation to the Police and that she was "still unsure on what she wanted done."(*Id.*) On February 13, 2014, when Plaintiff again met with Detective Corsibiero, she indicated that she only wished to make a statement and "want[ed] no further action to be taken by anyone." (*Supra* Part I.F.) Similarly, when Plaintiff met with her therapist in March, Plaintiff expressed "ambivalence" about whether she wanted to go ahead with the Hearing, stating that she "didn't want to deal with this any longer." It was finally on April 14, 2014 that Plaintiff committed to a decision about the Hearing and emailed Orlich, stating: "I would like to proceed." (*Id.*)

### B. Pre-Assault Failures and Title IX Liability

In addition to her Title IX claims arising out of University Defendants' alleged *post-assault* conduct, Plaintiff claims that University Defendants are liable for *pre-assault* response to the general problem of sexual violence among its students. (Pl. Mem. at 20-21.) Specifically, Plaintiff alleges that the deficiencies in the entire SUNY system, which were described in the OCR Compliance Review, contributed to an environment that deprived Plaintiff of protection under Title IX. (*Id.*) ("...these deficiencies both invited and permitted an environment that was indifferent, if not hostile, to the protection and equitable treatment of students that were sexually assaulted at SUNY campuses.") Basically, Plaintiff contends that the inherent deficiencies in the SUNY system, such as the alleged "unchecked rise in rapes on campus, coupled with the inability to maintain stability in the Title IX Coordinator's position, created a climate that contributed to the ultimate assault of Plaintiff." (*Id.* at 22.)

University Defendants move for summary judgment on this claim on the bases that: a) there are no cases in the Second Circuit which support the proposition that deliberate indifference *prior* to an assault claim can proximately cause a sexual assault; b) Plaintiff has not alleged that University Defendants had any prior knowledge of any incidents of sexual misconduct in which Verdejo was involved; and c) Plaintiff's reliance on the Voluntary Agreement is not enough to make a claim of deliberate indifference because that agreement was entered into by all SUNY schools and generally related to sexual assaults on SUNY campuses, not to SBU. (Def. Mem. at 24-30.). For the following reasons, the Court agrees with University Defendants.

### 1. Reliance on the Voluntary Agreement for a Claim

To start, the Court begins with University Defendants argument that Plaintiff cannot rely on the October Letter or the Voluntary Agreement as the Basis for her pre-assault liability claim.

In the Last Order, the Court already explained that the October Letter and Voluntary Agreement could be sufficient for Plaintiff to *plead* a claim of pre-assault liability at the pleadings stage because the documents suggested that Plaintiff was relying on more than just "past incidents of sexual assault on campus." (*See* Last Order at 17-18.)[22] What the Court then emphasized was that Plaintiff would have to *show* that these documents put University Defendants on *actual notice* that their *specific policies* and *responses* to sexual assault were deficient, and their subsequent failure to remedy these policies was the proximate cause of her sexual assault. (*Id.*) ("[I]n order for a university to violate Title IX through a policy of deliberate indifference, it must have actual knowledge of heightened risk that is *specific enough* to allow it to remedy such a policy.") This is where the Court finds that no reasonable juror could find that Plaintiff met her burden of proof.

## 2. Actual Knowledge of a Particular Program or Perpetrator

In the Last Order, the Court noted that the Second Circuit has not yet addressed the precise requirements for "actual knowledge" in the context of pre-assault Title IX liability. (*Id.*). But after surveying district and circuit courts throughout the country, the Court concluded that a successful claim would require proof that University Defendants knew about "sexual assault(s) committed in a *particular context or program* or by a *particular perpetrator or perpetrators*." (*See id.* at 17.)[23]

---

[22] In arriving at that decision, the Court predominantly relied on *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007). In *Simpson,* the Tenth Circuit held that the maintenance and support of the recruiting program, without proper supervision or training, constituted an "official policy" of the university. Importantly, the court in *Simpson* stressed the fact that the university maintained this program *despite* an actual knowledge of a significantly heightened risk of sexual assault. Specifically, the court in *Simpson* held that "(1) [the football coach had knowledge of] serious risk of sexual harassment and assault during college-football recruiting efforts; (2) [he] knew that such assaults had indeed occurred during CU recruiting visits; [and] (3) [he] nevertheless maintained an unsupervised player-host program to show high-school recruits 'a good time.'" *Id.* at 1184.

[23] *See* Last Order at 17(citing *Zamora v. N. Salem Cent. Sch. Dist.*, 414 F.Supp.2d 418, 424 (S.D.N.Y. 2006) (internal citation omitted) (holding that the actual knowledge standard may be satisfied by knowledge of a "substantial risk of serious harm" where there have been multiple prior allegations of the same or similar conduct that is at issue); *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1294-96 (11th Cir. 2007) (finding actual knowledge sufficient to impose Title IX liability for a student's rape that occurred in a UGA basketball player's dorm room where UGA officials' recruited the basketball player when they allegedly knew about his history of past sexual harassment at other colleges); *Mathis v. Wayne County Board of Education*, 782 F. Supp. 2d 542 (M.D. Tenn. 2011) (finding

Here, Plaintiff shows nothing that supports a finding that the October Letter or Voluntary Agreement allowed University Defendants to know that a specific program or policy of theirs was deficient. While Plaintiff is correct that the investigation was a system-wide compliance review, that is all that the investigation revealed—system-wide compliance *concerns*, not specific breaches of University Defendants. The October Letter states that on-campus reviews were conducted at SUNY-Albany, SUNY-Buffalo State College, SUNY-Morrisville State College, and SUNY-New Paltz. (October Letter at 2.) Perhaps for those schools, one could argue that the schools had actual notice about specific policies of theirs that were deficient. But to project one school's deficiency on another, or upon the entire cluster of SUNY schools, makes no sense because the results showed that the procedures for handling assault allegations were different at each school, and consequently, the severity of each school's breach differed.

For example, the structure and issues with Title IX Coordinators varied greatly amongst the four schools. The review showed that: SUNY-New Paltz had three designated Title IX Coordinators: The Dean of the Students, the Affirmative Action Officer, and the Chief of Campus Police; SUNY-Morrisville State College had designated its Director of Human Resources and Affirmative Action Officer as its Title IX Coordinator; SUNY-Buffalo State College had a designated Title IX Coordinator, but did not state that the Interim Senior Advisor served as the Title IX Coordinator; and SUNY-Albany had a single designated Title IX Coordinator, like University Defendants. (October Letter at 7, 10, 13, 15.)

---

sufficient knowledge where both the victims and the perpetrators were members of specific groups of students that had previously been involved in similar instances of assault, in the same context); *M. v. Stamford Bd. of Educ.*, No. 3:05–CV–0177, 2008 WL 2704704, at \*10 (D. Conn. July 7, 2008) (finding only school board's lack of disciplinary action after *notice of requisite specificity* could permit jury to find board made student more vulnerable to harassment), *vacated in part on other grounds*, 2008 WL 4197047 (D. Conn. Sept. 9, 2008)).

Again, the review makes sense for the purpose of extrapolating common concerns, and encouraging all 29 SUNY schools to enter the Voluntary Agreement and self-improve their systems. But the review and generic Voluntary Agreement cannot form the basis of imputing independent liability to University Defendants, who: operated their own website, hired their own personnel, ran their own diversity and student affairs departments, had their own staff assist in writing university policies, and conducted their own training on the school's policies.

More importantly, as this Court already discussed at length when addressing University Defendants' post-assault Title IX liability, University Defendants were substantially in legal compliance with the DCL guidelines *at the time* of Plaintiff's assault. (*See supra* Part IV.1.C.) Therefore, Plaintiff's claim that University Defendants should be liable for not resurrecting their policies before her assault falls flat.

And Plaintiff's argument that the frequent changes in who served as Title IX Coordinator reflects actual knowledge of a deficient policy also fails muster. (*See* Pl. Mem. at 22.) Plaintiff produces no evidence showing that the changes were due to the previous Title IX Coordinator not completing the role satisfactorily. Even if it were the reason, University Defendants' replacement of that individual would reflect conscientiousness, not deliberate indifference.

Finally, Plaintiff has not produced one iota of evidence revealing that University had specific knowledge that Verdejo ever had any sort of history of sexual harassment anywhere. *See Williams,* 477 F.3d 1282 (finding deliberate indifference on pre-assault Title IX claim, where university knew about that a specific athlete posed a threat to women because he had a long history of sexual misconduct and had already pleaded to criminal charges for sexual misconduct at other schools.) Nor has she produced evidence revealing that Verdejo was part of any particular group that had a known history of sexual harassment, akin to the situation in *Simpson.*

Because Plaintiff has not shown that University Defendants had actual knowledge that any particular program or policy of theirs was deficient or that Verdejo specifically posed a sexual harassment risk prior to her assault, the Court holds that, as a matter of law, University Defendants were not deliberately indifferent.[24]

### 3. No Proof of Proximate Cause

Because Plaintiff has put forth no facts from which a reasonably juror could find that University Defendants had actual knowledge of a specific deficient policy related to handling sexual assaults complaints on its campus, nor any facts showing a proclivity of Verdejo to engage in sexual assault, the Court finds that Plaintiff has failed to show that there was any specific knowledge and conduct that University Defendants engaged in that could arguably be the proximate cause of her assault. Accordingly, the Court finds that are simply no triable issues of fact related to her pre-assault liability claim.

The Court concludes this section by noting that the facts in this case raise distressing issues. Those issues fall in the gap that exists between aspirational guidelines and minimum statutory requirements. The Court is sensitive to the difficulties that Plaintiff has encountered on her route to redress. Unfortunately, it is a difficult route to traverse. In arriving at its decision today, the Court is not saying that University Defendants were model citizens, nor that their process was ideal. Even though University Defendants could have – and perhaps should have – demonstrated greater compassion in handling a sensitive allegation, their responsibility derives from the need to be nominally vigilant about access to educational opportunities through the loose framework of a

---

[24] (*See id.* at 16, note 7.) ("*Gebster* did not address whether actual knowledge of the risk would be necessary in cases where an official policy exists. 524 U.S. at 290. However, without actual knowledge, the policy itself would not be *deliberately* indifferent.")

discrimination statute. That statute and its associated jurisprudence places a limited onus on the shoulders of federally-funded schools. Here, that onus was met.

### C. State Law Claims Against Verdejo

Plaintiff's Complaint contains additional state law claims of assault, battery, and intentional infliction of emotional distress asserted against Verdejo. (Compl. ¶¶ 140-150.) On March 11, 2015, Verdejo filed his Answer to these claims along with a number of Counterclaims. (ECF No. 12.) On, April 20, 2015, Verdejo filed an Amended Answer and set of Counterclaims. (ECF No. 23.). Beyond these responses, no briefing has occurred for Plaintiff's state law claims.

District Courts have the discretion to deny supplemental jurisdiction over state law claims when: (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. S 1367(c). "The discretion to decline supplemental jurisdiction is available only if founded upon an enumerated category of 28 U.S.C. S 1367(c)." *Albertson Water Dist. v. Amerada Hess Corp. (In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.)*, 613 F. Supp. 2d 437, 442 (S.D.N.Y. 2009) (citing *Itar–Tass Russian News Agency v. Russian Kurier, Inc.,* 140 F.3d 442, 448 (2d Cir.1998)).

Here, the Court has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. S 1367(c)(3). Further, whilst Verdejo has submitted an answer and raised counterclaims, he has not engaged in any substantive motion practice or other time-intensive litigation related to those claims. Accordingly, declining supplemental jurisdiction over the state law claims would neither prejudice Verdejo nor impinge the values of economy, convenience, fairness, and comity. *Id.*

(citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)). Accordingly, Plaintiff's state law claims are dismissed without prejudice, and all claims in this action are hereby terminated.

## CONCLUSION

For the aforementioned reasons, University Defendants' Motion for Summary Judgment is GRANTED in its entirety, and the remaining state law claims in the Complaint are DISMISSED without prejudice. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 81, terminate Defendant Daniel Verdejo, terminate the case, and to enter judgment in favor of Defendant Stony Brook University and Defendant State University of New York.

SO ORDERED.

Dated:    October 30, 2018
          White Plains, New York

_____
NELSON S. ROMÁN
United States District Judge